582 F.2d 1043
 CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
Commonwealth of Pennsylvania, Intervenor.
 Nos. 76-2283, 77-1008 and 77-1487.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1977.
Decided May 30, 1978.
As Modified on Denial of Rehearing July 31, 1978.
 
 Gordon P. MacDougall, Sp. Asst. Atty. Gen., Washington, D. C., R. Eden Martin, Chicago, Ill., William G. Mahoney, Washington, D. C., Robert S. Sugarman, Chicago, Ill, for petitioners.
 Henri F. Rush, Associate Gen. Counsel, ICC, Washington, D. C., Robert Lewis Thompson, Dept. of Justice, Washington, D. C., for respondents.
 Before FAIRCHILD, Chief Judge, and SPRECHER* and TONE, Circuit Judges.
 TONE, Circuit Judge.
 
 
 1
 New provisions governing the abandonment of railroad lines and the discontinuance of rail service were adopted by Congress as part of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4-R Act), 90 Stat. 127, 146, §§ 802, 809(c), and codified as § 1a of the Interstate Commerce Act, 49 U.S.C. § 1a.[1] Pursuant to these provisions, the Interstate Commerce Commission adopted implementing regulations. 41 Fed.Reg. 48520 as amended 42 Fed.Reg. 25327 (to be codified in 49 C.F.R. §§ 1121.10, et seq.). The several petitions for review before us challenge these regulations as inconsistent with the statute insofar as they (a) permit indefinite postponement of the issuance of a certificate of abandonment when a subsidization offer has been made but an agreement is not reached between the railroad and the potential subsidizer within six months, (b) prescribe certain factors to be omitted or included in the Commission's determination of avoidable cost and reasonable return on line for the purpose of determining the adequacy of a subsidization offer, (c) require that a petition to investigate be verified and be filed within 35 days after the filing of the application for abandonment or discontinuance, and (d) omit certain information from the revenue data to be submitted by a railroad in support of an application for abandonment or discontinuance. This court has jurisdiction under 28 U.S.C. §§ 2321 and 2342. We sustain challenges (a) and (b) and reject (c) and (d).
 
 
 2
 * The Petition of the Railroads
 
 
 3
 In No. 76-2283 a group of railroads attack the provision permitting the Commission to postpone indefinitely the issuance of a certificate authorizing abandonment or discontinuance when a subsidization offer has been made but the railroad and the potential subsidizer fail to reach a financial assistance agreement within six months. They also challenge the regulations dealing with the determinations of "the avoidable cost of providing rail freight service on such line," and the "reasonable return on the value of such line," § 1a(6) (a)(ii)(A) and (7), insofar as these regulations (a) interpret the term "current costs" in the statutory definition of "avoidable cost," § 1a(11) (a), to mean that portion of historical costs that are allocated to the current period; (b) limit "expenditures to eliminate deferred maintenance," § 1a(11) (a), to expenditures necessary to meet federal railroad administration safety standards for Class I track (safe at speeds up to 10 miles per hour); and (c) do not adequately allow for the difference between the cost of equity capital and the cost of debt capital or the effects of income taxes.
 
 Background of the Statute
 
 4
 Inability to find relief from the burden of uneconomical branch lines was one of the problems of the Penn Central Transportation Company and other northeastern railroads that suffered financial disaster in the period preceding the 4-R Act. See In re Penn Central Transportation Co., 382 F.Supp. 831, 836-837, 841 (E.D.Pa.1974). A bankrupt railroad attempting to rid itself of such a line in a proceeding under 49 U.S.C. § 1(18) (22), would find itself enmeshed in "drawn-out hearings before the Interstate Commerce Commission." In re Reading Company, 378 F.Supp. 474, 480 (E.D.Pa.1974); see In re Penn Central Transportation Co., 384 F.Supp. 895, 903 (Sp.Ct.R.R.R.A.1974). Congress was acutely aware of this problem by reason of having subsidized the successor of these railroads, Consolidated Rail Corporation, in the years preceding the adoption of the 4-R Act.[2] The Senate Committee on Commerce, which, after holding hearings on the subject, originated the version of § 1a that was eventually enacted, recognized that the abandonment problem plagued the entire railroad industry, S.Rep. No. 94-499, 94th Cong., 1st Sess. 39-44 (1975), observing that "the regulatory climate constrained management's ability to . . . abandon obsolete properties and lines," and concluding that "the railroad industry should not be forced to continue to internalize all losses from branch line operations, thereby further jeopardizing the industry's already precarious economic health." Id. at 3, 44, U.S.Code Cong. & Admin.News 1976, pp. 14, 17, 58. Although the Congressional focus was primarily upon the abandonment problem, Congress recognized discontinuance of service as part of the same problem and treated it like abandonment in the statute.
 
 
 5
 When Congress had addressed the problem as it affected the northeastern lines in the Regional Rail Reorganization Act of 1973, Pub.L. 93-236, 87 Stat. 986,[3] it had prohibited abandonment or discontinuance when a potential subsidizer had offered a "continuation subsidy" covering the difference between revenues and avoidable cost plus a reasonable return attributable to the line or had offered to purchase the line. Section 304(c), 45 U.S.C. § 744(c). Instead of itself defining "avoidable cost" and "reasonable return," as it was to do three years later in the 4-R Act, Congress left them to be defined by the ICC's Rail Services Planning Office.[4] Section 205(d) (3), 45 U.S.C. § 715(d)(3).
 
 
 6
 As we shall see, significant departures from this approach were made in § 1a. That section provides that, when a "financially responsible person" makes a "continuation subsidy" offer that is likely to cover the difference between revenues and avoidable cost plus a reasonable return on line, abandonment or discontinuance is not flatly prohibited, but instead is postponed for a "reasonable time, not to exceed 6 months." The new statute not only itself defines the terms "avoidable cost" and "reasonable return" but defines them differently than did the Commission's Rail Services Planning Office under the 1973 Act. These and other provisions of § 1a pertinent to the consolidated reviews before us are discussed in connection with specific challenges to the regulations.
 
 The Statute
 
 7
 The 4-R Act repealed the abandonment and discontinuance provisions contained in § 1(18) (22) of the Interstate Commerce Act and provided a new abandonment and discontinuance procedure in new § 1a. That section is to apply to railroads other than the northeastern railroads, which remain subject to the abandonment and discontinuance provisions of the 1973 Act, as amended by the 4-R Act. New § 1a establishes a procedure for Commission consideration of an application by a railroad for a certificate of abandonment or discontinuance. The Commission first decides whether the proposed abandonment or discontinuance is in the public interest. Upon a determination that it is, the Commission issues a certificate of abandonment or discontinuance, unless it finds that a financially responsible person has made an offer of financial assistance to enable the service to be continued that is likely to meet certain criteria. If it finds such an offer has been made, the Commission is to postpone issuance of the certificate for "a reasonable time, not to exceed 6 months" to permit the negotiation of a financial assistance or purchase and sale agreement between the railroad and the prospective subsidizer.
 
 
 8
 Paragraphs (1) through (5) of § 1a cover the procedure for considering and ruling on applications, except for the procedure relating to subsidization offers. Paragraph (1) provides that a railroad may not abandon a line or discontinue any service without first obtaining from the Commission a certificate declaring that the "present or future public convenience and necessity require or permit such abandonment or discontinuance." An application for a certificate must be submitted to the Commission, together with a notice of intent to abandon or discontinue, at least 60 days before the proposed effective date of the abandonment or discontinuance.[5] Paragraph (2) requires the railroad to give interested parties notice of its intent to abandon or discontinue. Paragraph (3) provides that during the 60-day period between submission of the application and the proposed effective date the Commission may on its own initiative, and must upon petition, institute an investigation of the proposed abandonment or discontinuance. "If no such investigation is ordered, the Commission shall issue such a certificate, in accordance with this section, at the end of such 60-day period." If, however, an investigation is ordered, the Commission is to order a postponement of the proposed effective date "for such reasonable period of time as is necessary to complete such investigation."[6] Paragraph (4) provides that if a certificate is issued without an investigation, the abandonment or discontinuance may take effect 30 days after the certificate is issued. If an investigation is conducted, the Commission may issue the certificate as requested, issue it with modifications or subject to terms and conditions, or refuse to issue it. When a certificate is issued after an investigation, abandonment or discontinuance may take effect 120 days after the certificate is issued.[7]
 
 
 9
 Subsidization offers are dealt with in paragraphs (6) and (7) of § 1a. Under paragraph (6), when the Commission finds that the public convenience and necessity permit the abandonment or discontinuance, that finding is to be published in the Federal Register. A subsidization offer may then be made. In that event the Commission is to determine within 30 days of the publication in the Federal Register, whether the potential subsidizer[8] is financially responsible and whether the offer "is likely" to
 
 
 10
 (A) cover the difference between the revenues which are attributable to such line of railroad and the avoidable cost of providing rail freight service on such line, together with a reasonable return on the value of such line; or
 
 
 11
 (B) cover the acquisition cost of all or any portion of such line of railroad.
 
 
 12
 Upon an affirmative finding, the Commission "shall postpone" the issuance of the certificate "for such reasonable time, not to exceed 6 months," as is necessary to enable the potential subsidizer to enter into a binding subsidization agreement with the railroad. Paragraph (7) provides that when an offer of financial assistance has been made, the Commission is to
 
 
 13
 determine the extent to which the avoidable cost of providing rail service plus a reasonable return on the value of the rail property involved exceed the revenues attributable to the line or railroad or the rail service involved.
 
 
 14
 The purpose of this determination is to enable the Commission to decide under paragraph (7) whether the offer is "likely" to cover the difference between revenues and "the avoidable cost." The terms "avoidable cost" and "reasonable return" are defined in paragraph (11) of § 1a.The Commission's Order and Regulations
 
 
 15
 Following the adoption of the 4-R Act, the Commission issued a notice of proposed rule making and accompanying draft regulations on abandonment and discontinuance of rail service. 41 Fed.Reg. 31878 (1976). Interested persons were given an opportunity to submit written statements. Railroad interests, the United States Department of Transportation, and other interested parties submitted statements. In November 1976 the Commission adopted the regulations that are at issue in this proceeding and issued an explanatory Report. In May 1977, in response to various petitions for reconsideration, the Commission made a few minor revisions in the regulations and issued a Report on Reconsideration explaining its action.
 
 
 16
 The regulations are divided into four subparts. Subpart A consists of a general statement of purpose and definitions. Subpart B implements the diagram requirements of paragraph (5) of § 1a, which are not involved here. See note 7, Supra. Subpart C prescribes procedures for filing and processing applications for abandonment or discontinuance, making offers of financial assistance and conversion of abandoned rail properties to other public uses (provided for in paragraph (10) of § 1a). Subpart D contains standards for determining revenues attributable to a line that is the subject of an abandonment or discontinuance application, avoidable cost of providing service over the line, and reasonable return on the value of the line. The regulations that are challenged appear in subparts C and D.
 
 
 17
 A. Indefinite Postponement of Issuance of Certificate
 
 
 18
 The railroads first challenge the provision of the regulations that allows the Commission to postpone the issuance of a certificate indefinitely if a subsidization offer is received and the railroad and the potential subsidizer fail to reach a financial assistance agreement within 6 months. Section 1121.38(i)(2). They contend that this provision is contrary to paragraph (6) (a) of § 1a, which provides that if the commission makes the requisite finding with respect to a subsidization offer, it
 
 
 19
 shall postpone the issuance of a certificate of abandonment or discontinuance for such reasonable time, not to exceed 6 months, as is necessary to enable such person or entity to enter into a binding agreement, with the carrier seeking such abandonment or discontinuance . . . .
 
 
 20
 The challenged regulation provides that, if the parties are unable to reach agreement during the six-month period, the Commission may take one of the following actions:
 
 
 21
 (i) Issue a final certificate at the end of the 6-month period . . .;
 
 
 22
 (ii) Reopen the underlying abandonment or discontinuance proceeding to reevaluate the application on its merits in light of the financial assistance offer;
 
 
 23
 (iii) Direct the carrier to continue to provide rail freight service for an additional year in return for compensation to be computed by the Commission (in accordance with certain standards) . . . or
 
 
 24
 (iv) Take whatever action is appropriate in the particular situation and in conformity with section 1a of the Act. Such action may include but not be limited to setting the matter for arbitration subject to the final review of the Commission.
 
 
 25
 Section 1121.38(i)(2).
 
 
 26
 The railroads argue that only the first of these four options is authorized by § 1a of the Act, because paragraph (6) of that section permits postponement of the issuance of the certificate for only six months. The Department of Justice has filed a brief making the same argument. The Commission's position is that the provision "is necessary to effectuate the intent of Congress that every opportunity be afforded to preserve rail service, especially if a potential subsidizer or purchaser has made a reasonable offer of assistance," as it says in its Report, and that a refusal by the railroad to accept a reasonable subsidy offer constitutes "substantially changed circumstances" within the meaning of § 17(9)(g) of the Interstate Commerce Act, which permits reopening of a Commission decision, including one under § 1a, upon "material error, new evidence, or substantially changed circumstances."
 
 
 27
 Paragraph (6) of § 1a states that the postponement of the issuance of a certificate is "not to exceed 6 months." We do not know how Congress could have made it any plainer. If there were any doubt, a comparison could be made between paragraph (6) and an earlier paragraph of § 1a that also gives the Commission postponement authority, paragraph (3). The words used for that purpose are the same in the two paragraphs, except that in paragraph (6) the phrase "not to exceed 6 months" is included. The Commission would have us read "for such reasonable period of time as is necessary," appearing in paragraph (3), and "for such reasonable period of time, not to exceed 6 months, as is necessary," appearing in paragraph (6), as meaning the same thing. This we decline to do.[9]
 
 
 28
 Nor can the existence of an impasse in subsidy negotiations constitute "substantially changed circumstances" within the meaning of § 17(9)(g) of the Act. The Commission's determination of whether abandonment is consistent with the public convenience and necessity is made before any consideration of a subsidy offer and without regard to whether a subsidy may be available. The regulations themselves state, in § 1121.38(h)(3):
 
 
 29
 The Commission shall not consider an offer of financial assistance or any resulting agreement in making its initial finding on the merits of abandonment or discontinuance application(s).
 
 
 30
 If the availability of a subsidy cannot properly be considered by the Commission in its initial abandonment or discontinuance decision, it can hardly be a "changed circumstance" justifying reopening of that decision.
 
 
 31
 No doubt, as the Commission argues, the provisions for subsidization were intended to provide a reasonable opportunity for the salvaging of service. What is a reasonable time, however, was for Congress to decide in light of its apparent determination to grant relief from the prolonged administrative proceedings that had attended abandonment and discontinuance.
 
 
 32
 In the 1973 Act Congress flatly prohibited the issuance of a certificate so long as a reasonable subsidy offer was outstanding. 45 U.S.C. § 744(c). The 4-R Act, which, it will be recalled, left the northeastern lines still subject to the 1973 Act, preserved that prohibition and added a provision, 45 U.S.C. § 744(d), giving such a railroad applying for an abandonment or discontinuance certificate the right to refuse to enter into a subsidy agreement only when the Commission determines "on petition by any affected party" that the subsidy agreement would "substantially impair" the railroad's ability to meet its existing obligations. The omission of a similar cram-down provision in § 1a confirms our interpretation of the "not to exceed 6 months" limitation.
 
 B. Avoidable Cost and Return on Line
 
 33
 The railroads' second challenge to the regulations concerns the standards for determining avoidable cost and reasonable return on line for purposes of the Commission's determination under § 1a(6)(a)(ii) and (7) of whether the offered financial assistance is adequate.
 
 1. "Current Cost" of Equipment
 
 34
 The first issue is whether in determining avoidable cost the depreciation cost for locomotives, freight cars, and other equipment attributable to branch line service should be based on (a) the original or book cost of that equipment or (b) the cost that would be avoided if the service were terminated and the equipment used elsewhere on the railroad, I. e., the cost of purchasing new equipment.
 
 
 35
 An oversimplified illustration may be useful: Assume that at the beginning of the subsidy year in question[10] a locomotive used only in branch line service that cost $90,000 has been used for 29 of its 30 years of useful life and has been depreciated on a straight-line basis. It will be depreciated the final $3,000 in its 30th year of service. If branch line service continues for that year and the locomotive is needed on the branch, the railroad will be required to purchase a new locomotive for use on the main line. It will cost $600,000, also have a 30-year useful life, and be depreciated at the rate of $20,000 per year. If branch line service is discontinued now, the railroad can use the old locomotive on the main line for its final year of useful life and postpone purchasing a new one, so the increment to depreciation of the main line equipment that year will be $3,000 instead of $20,000. Therefore, if branch line service is continued, depreciation costs for total service provided by the railroad will be increased by $20,000.
 
 
 36
 Under alternative (a) above, which does not take into consideration the systemwide increase in depreciation costs, the avoidable cost is only $3,000, the book cost of the locomotive utilized on the branch line. Under alternative (b), the avoidable cost is $20,000, because that is the increased depreciation cost that the railroad will incur if branch line service is continued.
 
 
 37
 The regional standards adopted by the Commission under the 1973 Act, which left it to the Commission's Rail Services Planning Office to define avoidable cost, chose alternative (a). 49 C.F.R. § 1125.5(5). The new regulations issued under the 4-R Act admittedly are based on those regional standards[11] and refer to book cost. Sections 1121.42(c)(4) and 1121.42(m).
 
 
 38
 The 4-R Act, however, contained its own definition of avoidable cost: "all expenses which would be incurred by a carrier in providing a service which would not be incurred" if the line were not abandoned or the service not discontinued, including "all cash outflows which are incurred" absent the abandonment or discontinuance, which in turn includes, Inter alia, "the current cost of freight cars, locomotives and other equipment." Section 1a(11)(a).
 
 
 39
 Relying heavily on the word "incurred," the Commission argues that "current cost" means the portion of historical cost allocable during the subsidy year in question to the branch line or service that is the subject of the application. The railroads, of course, rely on the literal meaning of "current cost," as well as the context and legislative history. We think the railroads have the better of the argument. The natural meaning of the words used, "the current cost" of equipment "which would be incurred . . . in providing a service" but "would not be incurred" if the service were not provided, seems to us to be the actual present dollar saving that would result from discontinuance or abandonment.
 
 
 40
 This view is supported by the legislative history. During 1975 the Senate conducted hearings on various aspects of national railroad policy. Railroads 1975, Hearings Before The Senate Committee on Commerce, 94th Cong., 1st Sess. (1975) (cited hereinafter as "Hearings"). These hearings included consideration of some 15 bills pertaining to branch line service. Hearings 657-658. One of these, S. 863, contained amendments to the then existing abandonment provisions contained in § 1(18) (22) of the Interstate Commerce Act. It proposed a subsidy provision (proposed new § 1(27)(A), Hearings 268-269) that would have given the Interstate Commerce Commission power to postpone the issuance of an abandonment certificate for a period not to exceed 90 days, once a subsidy offer had been made that covered the difference between revenue and avoidable costs plus a reasonable return on the value of rail properties. The 90-day extension was provided to permit a subsidy plan to be worked out. The terms "avoidable cost" and "reasonable return" were defined as they were under the 1973 Act by the Commission's Rail Services Planning Office. (Proposed new § 1(22)(E), Hearings 263-264.)
 
 
 41
 Appearing as a witness on behalf of the railroads at those hearings was one J. H. Williams, whose testimony seems to have been taken seriously by the Committee[12] and, as we shall see, influenced the Senate's contribution to what eventually became § 1a. Williams contended that a subsidy offer under S. 863 would not adequately compensate a railroad for continuing branch line service because of deficiencies in RSPO's regulations adopted under the 1973 Act. He criticized these regulations for, among other things, adopting a historical cost standard for determining avoidable locomotive and freight car ownership costs (depreciation) and urged that "avoided acquisition (or 'purchase new') costs is the correct measure of the avoidable cost of equipment ownership."[13] Williams recommended that the proposed new § 1(27)(A) be amended to replace the avoidable cost standard with a fully allocated cost standard.[14] Hearings 807. This proposal was adopted by the Senate in the bill that was to become the 4-R Act, S. 2718, but was ultimately rejected by the Senate-House Conferees in favor of the avoidable cost standard.
 
 
 42
 Williams recommended that the Commission publish not only new standards for determining fully allocated costs but also new standards governing the determination of reasonable return on line. Hearings 807. An allowance for income taxes, he proposed, should be made in the return calculation by adjusting the rate of return, which he defined as the opportunity cost of capital. In addition, he proposed that the investment based upon which return is calculated should include "all cash inflows which are foregone and all cash outflows which are required . . . as a result of continued operation of the line segment . . . and . . . shall include . . . the tax benefit from retirement; The current cost of freight cars and locomotives ; working capital; required capital expenditures; and expenditures to eliminate deferred maintenance." Id. (Emphasis supplied.)
 
 
 43
 The language of Williams' proposed amendment ultimately found its way into the definition, not of reasonable return on line, but of avoidable costs in the 4-R Act Congress enacted. The tortuous route by which it did so was as follows: At the conclusion of the Senate Hearings, S. 2718 was introduced and, as noted above, was subsequently amended and enacted as the 4-R Act. That bill included what became, after amendments, § 1a. Also, as noted above, the initial version of § 1a embraced, for subsidy purposes. Williams' fully allocated cost standard instead of the avoidable cost standard. It did not contain, however, any definition of fully allocated cost or of reasonable return on line. S.Rep. No. 94-499, 94th Cong., 1st Sess. 291 (1975). The House passed H.R. 10979 as an amendment to S. 2718 and in so doing deleted the proposed new § 1a in its entirety, thus omitting any provision for a continuation subsidy. H.R. Rep. No. 94-725, 94th Cong., 1st Sess. 16-17 (1975). The Senate-House Conferees agreed to restore § 1a, including its subsidy provisions, but substituted the avoidable cost standard for the fully allocated cost standard and added definitions of avoidable cost and reasonable return on line. The definition of avoidable cost used the language of, and was plainly drawn from, Williams' proposed amendment relating to the investment base on which reasonable return on line would be calculated. Williams' proposed language, "the current cost of freight cars and locomotives," became "the current cost of freight cars, locomotives and other equipment" in § 1a(11)(a).[15] Williams had used this language to describe cash spent "to acquire freight cars and locomotives which the railroad would avoid if the abandonment occurred." Hearings 805-806. In the context of avoidable cost, then, the "current cost of freight cars, locomotives and other equipment" would mean the acquisition costs (currently allocable as depreciation) of freight cars, locomotives, and other equipment incurred because of having to continue branch line service.
 
 
 44
 One more significant event concludes this history of the "current cost" phrase and the compromise that brought it into the Act: a House Amendment to § 1a that would have defined avoidable cost as having the meaning given to the term under the 1973 Act was rejected. S.Rep. No. 94-595, 94th Cong., 1st Sess. 219 (1976).
 
 
 45
 Congress might have chosen, as a matter of policy, to allocate to the branch line for subsidy purposes those depreciation costs that would have been allocated to that line if the service had continued on an unsubsidized basis. Consistent application of this approach would also seem to require allocation to the branch line of its share of systemwide fixed costs, which Congress clearly decided not to do when, as a result of the conference compromise, the Senate version of § 1a, containing a fully allocated cost standard, gave way to an avoidable cost standard. But, as part of the compromise, avoidable cost was redefined to include, Inter alia, "the current cost of freight cars, locomotives and other equipment." The effect of this was to require that the subsidy cover, not the branch line's share of systemwide fixed costs that accounting theory might call for, but the more practical actual dollar difference between the railroad's systemwide variable depreciation costs if the service is continued and the systemwide variable depreciation costs if the service is discontinued.[16]
 
 
 46
 The dissent argues that the result of our interpretation is that, in the illustration given above, "the railroad receives an effective depreciation value of $37,000." This figure, as we understand it, is made up of the $20,000 portion of the cost of the new locomotive allocable to the year in question, which the railroad takes as depreciation, and a "subsidy bonus" of $17,000 that is said to result from "plac(ing) a replacement cost value on the 29-year old car being used on the branch line." With respect, the $17,000 is not an element of "depreciation value." The total systemwide "depreciation value" is the $20,000 for the first year of the new locomotive plus $3,000 for the 30th year of the old locomotive. The dissent's additional $17,000 is, if anything, the presumed intangible value to the railroad of being able to use a new locomotive on its main line instead of the old one it would have used if the branch line service had been discontinued.
 
 
 47
 If branch line service were discontinued, the depreciation costs of $23,000 would be decreased by $20,000, because the railroad would use the old locomotive on the main line instead of buying a new locomotive. The question is whether the subsidizer will pay the entire $20,000 or only $3,000. We think the language used by Congress means the subsidizer is to pay the entire $20,000.[17]
 
 
 48
 2. "Expenditures to Eliminate Deferred Maintenance"
 
 
 49
 The railroads also challenge the Commission's interpretation of the words, "expenditures to eliminate deferred maintenance," which also appear in the statutory definition of avoidable cost. Again, notwithstanding the new statutory language, the Commission followed its regulations under the 1973 Act, this time merely adopting verbatim the language of those regulations. Section 1121.42(b) of the new regulations provides that rehabilitation costs are not to be included unless
 
 
 50
 (A) the track involved does not meet minimum Federal Railroad Administration (FRA) Class I safety standards (49 CFR 213) . . . ; or (B) the potential subsidizer requests a level or service which requires expenditures for rehabilitation.
 
 
 51
 With respect to (A), FRA Class I safety standards are satisfied if the track is safe for operating speeds of 10 miles per hour or lower. 49 C.F.R. § 213.9. The railroads argue that frequently the level of efficient railroad operation far exceeds 10 miles an hour, and in such cases it would be economical to rehabilitate the line above Class I safety standards to produce savings in the costs of labor, fuel, rental of equipment, etc.; yet the regulation does not permit recovery of "expenditures for deferred maintenance" necessary to rehabilitate the line above the 10-miles-per-hour level.
 
 
 52
 Initially we sustained the railroads' challenge to § 1121.42(b). Upon reconsidering the point as a result of the Commission's petition for rehearing, however, we have reached a contrary conclusion. Congress' requirement is that the railroad recover from the subsidizer "expenditures to eliminate deferred maintenance." If the potential subsidizer requests a level of service that requires expenditures for rehabilitation in excess of those necessary to bring the track involved up to Class I safety standards, those expenditures are included in avoidable costs under Clause (B) of § 1121.42(b). If such a request is not made, the railroad will only need to make those expenditures for deferred maintenance that are necessary to bring the track up to Class I safety standards, see Clause (A). In the latter event, there will be no expenditures for deferred maintenance that the railroad does not recover from the subsidy. If, as a result of having to operate trains at speeds no greater than 10 miles per hour the railroad will incur additional cost, they can be recovered as other elements of avoidable cost. Accordingly, the railroad will be made whole even if it is required to operate the line in question inefficiently.
 
 
 53
 It may well be, as the railroads argue, that the Commission was unwise not to leave itself free to tie the subsidization of deferred maintenance to the most efficient level of operation. Perhaps the public interest would have been better served if avoiding inefficiency in operation had been accorded a higher place on the Commission's scale of values than continuation of service. These are matters for the Commission's judgment, however. A court may not set aside the Commission's action so long as the regulations permit the railroad to recover expenditures actually made for deferred maintenance and other avoidable costs, as the statute requires.
 
 
 54
 If the regulations did not provide that avoidable costs are to include all expenditures actually made for deferred maintenance and all expenditures required because of inefficiency of operations at a 10-miles-per-hour level, they would be inconsistent with the statute. As we read them, however, they do require that the subsidy make the railroad whole for its avoidable costs in these categories, and § 1121.42(b) is therefore valid.
 
 
 55
 3. Cost of Equity Capital in Determining Return on Equipment
 
 
 56
 The Commission recognizes that the term "avoidable cost," as defined by Congress, encompasses capital costs as well as operating expenses.[18] Accordingly, the Commission provided for a return on investment in locomotives, § 1121.42(c)(6), and freight cars, § 1121.42(L )(3), as an increment of avoidable cost.[19] The rate of return used in computing the return on investment for both locomotives and freight cars is "the rate of interest which apply to the latest equipment trust certificates, conditional sales agreements or equipment lease agreements entered into by the railroad" to purchase or lease new locomotives and freight cars. Sections 1121.42(c)(6)(iv) and 1121.42(L )(3).
 
 
 57
 Thus, although both debt and equity capital are invested in locomotives and freight cars, the regulations provide a single rate of return based on the cost of debt capital. The Commission recognizes in its brief and in its Report[20] that the railroads should be compensated for their cost of equity capital but states that the railroads have failed to propose a specific method of measuring that cost.[21] It attempts to justify its reliance solely on the cost of debt capital by arguing that its regulations do provide an "effective return" on equity capital while at the same time promoting administrative convenience.[22]
 
 
 58
 Neither convenience nor the failure of the railroads to propose a specific method of measuring the cost of equity capital is a justification for the Commission's failure to develop and adopt a standard consistent with the Congressional intent or for us to sustain a regulation we find to be inconsistent with the statute. Congress gave the Commission and not the railroads the responsibility of developing regulations that would carry out the purposes of the statute. We note that for purposes of another provision of the 4-R Act, § 212, 49 U.S.C. § 1(14)(a), the Commission has been able to devise a method of determining the cost of equity capital. See Report of Commission, Car Service Compensation Basic Per Diem Charges Formula Revision in Accordance with the Railroads' Revitalization and Regulatory Reform Act of 1976, Ex Parte No. 334, pp. 29-70 (August 1, 1977).[23]
 
 
 59
 As for the Commission's assertion that measuring the entire return by the cost of debt capital gives the railroad an "effective return" on the cost of equity capital, we are not persuaded. Unless, by coincidence in a particular instance, a reasonable return on debt capital is exactly equal to what a reasonable return on equity capital would be if allowed, either the railroad or the potential subsidizer will be unfairly treated under the Commission's regulations.
 
 
 60
 The regulations are therefore invalid insofar as they disregard the different costs of equity and debt capital in providing for the determination of permitted return on investment in locomotives and freight cars.
 
 
 61
 Another argument is raised obliquely by the railroads. They argue that, in determining avoidable cost, the return on investment in the railroads' existing fleet of locomotives and freight cars should be based on replacement cost. This argument has two facets: (1) The rates of return should be the current debt and equity rates, rates "which would have to be incurred to buy new cars and locomotives costs which could be avoided if the branch line were abandoned or service discontinued;" thus (2) the investment base upon which the return is calculated should not be the book cost, as the regulations provide,[24] but the replacement cost. The railroads' position on these points is stated in the course of arguing in their brief that the rate of return on equipment should reflect the cost of equity capital as well as the cost of debt capital.[25] They do not develop this extension of the replacement cost position to any extent, do not even include it in the summary of the argument for the part of their brief in which it appears, and did not mention it in oral argument. In dealing with this matter in the Report, the Commission stated as follows:
 
 
 62
 (b) Equipment investment base. The investment base to which the allowable return is applied flows from the computation of original cost less accrued depreciation. DOT states it has petitioned the Commission to institute a proceeding to evaluate the basis of valuing assets. In effect, it appears to favor the cost of reproduction new less depreciation as the basis for valuing assets, a position seemingly at variance with its views in Ex Parte No. 293, Sub No. 2. It concedes that such a change would require a change in the cost of capital standard, so that the inflation factor would not be reflected twice.
 
 
 63
 DOT's proposal for valuing assets would have far-reaching consequences; we believe that it would be more appropriately considered in a general proceeding involving all users of rail service, rather than a rulemaking proceeding limited to the prescription of branch line abandonment and subsidy standards.
 
 
 64
 Because the matter is not squarely raised by the railroads or adequately discussed in any of the briefs and is still apparently open before the Commission, it would be inappropriate for us to rule upon it at this time. Apparently the Commission contemplates an examination of the matter in greater depth "in a general proceeding involving all users of rail service." We are not advised whether such a proceeding has been instituted or is in the offing. In any event, the Commission will be reexamining the pertinent sections of the regulations before us in view of our ruling with respect to the rate of return. If the railroads are dissatisfied with the result, they can challenge the Commission's new regulations by another petition for review.
 
 
 65
 4. Cost of Capital for Railroads in Reorganization
 
 
 66
 The Commission again ignored the differing costs of equity and debt capital in its regulations governing the determination of reasonable return on the value of the branch line for railroads in reorganization. Section 1a(11)(b) of the statute defines "reasonable return" for a railroad in reorganization as "the mean cost of capital of railroads not in reorganization." The regulations, on the other hand, in § 1121.44(b), provide that the "reasonable return" of a railroad in reorganization shall "be the average yield on all railroad bonds for the week immediately preceding the execution of the subsidy agreement, as quoted by any standard investors' service . . . ."[26] In its report, the Commission admits that "reliance on average railroad bond yield is an imperfect method for accomplishing Congressional intent," but states that it had "no better data on which to base the standard," and when better data is acquired the standard can be revised.[27]
 
 
 67
 Here, as in the case of the standard for determining the cost of capital of railroads not in reorganization, the Commission is not free to throw up its hands and disregard Congress' direction simply because it finds it difficult to perform the task Congress has set for it. The regulations are invalid insofar as they exclude the cost of equity capital for railroads in reorganization.
 
 5. Effect of Income Taxes
 
 68
 The railroads also assert that the Commission's failure to allow consideration of the cost of equity capital in determining return permitted on locomotives and freight cars and return permitted to carriers in reorganization is compounded by the failure to provide for consideration of the effects of income taxes upon the return on equity.
 
 
 69
 The railroads' first complaint is that the regulations, in providing for the determination of the return on investment in locomotives and freight cars as an increment of avoidable cost,[28] fail adequately to take into account the effects of income taxes on the return on equity capital. They rely upon paragraph 11(a) of § 1a, which defines "avoidable cost" of branch line service and is applicable to return on investment in locomotives and freight cars because of the classification of that return as an increment of avoidable cost. That definition includes
 
 
 70
 (iv) the foregone tax benefits from not retiring properties from rail service and Other effects of applicable Federal and State income taxes.
 
 
 71
 (Emphasis supplied.) Indisputably, the regulations fail to comply with this requirement. The Commission offers no explanation of why, and does not even mention this point in its brief. The railroads suggest that the Commission can meet its obligations under § 1a by either treating taxes on the return on equity capital as a separate expense or by properly adjusting the rate of return on equity capital. The Commission's attempts to allow for the effects of income taxes in computing the return on line for a railroad in reorganization, brings us to the railroads' second point.
 
 
 72
 They complain that even though the regulations make allowances for income taxes in computing the return on line for railroads in reorganization (§§ 1121.44(b) and (c)) they still fail adequately to take account of the effects of income taxes on the return on equity capital. We have held that § 1121.44(b) is invalid insofar as it does not reflect the cost of equity capital to railroads in reorganization. To the extent that it does not, A fortiori, any attempt to adjust the return for railroads in reorganization to allow for the effects of income taxes could not allow for the effects of income taxes on the return on equity capital. Again the Commission utterly ignores this point in its brief.
 
 
 73
 The railroads' position with respect to the effects of income taxes appears to have substance. Yet the Commission's position may have a basis of which we are not aware. Since the Commission has not so far deigned to mention the tax effects issues raised by the railroads, either in its brief or Report, and the regulations must be remanded for other reasons in any event, the Commission should reconsider this aspect of the regulations. If it adheres to its present position, it should explain why it believes its regulations are consistent with the Act, so they can be intelligently reviewed by a court.
 
 
 74
 A final footnote at the end of the railroads' brief is addressed to an adjustment in return on line, which is not mentioned elsewhere. It is said that the adjustment that § 1121.44(c) of the regulations allows in the return on the equity portion of the investment on line is inadequate, because using the "current (cash) effective" tax rate for the overall operations of the railroad would reflect tax effects attributable to non-branch line operations and thus cause the branch costs to be subsidized in part by the other operations of the railroad. The Commission, having made no response to this seemingly plausible criticism, should reconsider this aspect of the regulations on remand and, if it adheres to its present position, explain its reasons.
 
 II
 
 75
 The Petition of American Railway Supervisors' Association, et al.
 
 
 76
 In No. 77-1008 national labor organizations which represent employees in the railroad industry attack as contrary to § 1a the requirements of the regulations that a petition to investigate be verified, § 1121.36(a)(1), and "be filed with the Commission within 35 days of the filing with the Commission of an abandonment or discontinuance application," § 1121.36(c)(1).
 
 
 77
 The reason for the verification requirement is explained by the Commission in its Report on Reconsideration as follows:
 
 
 78
 (T)he requirement for verification is the least restrictive precaution to the filing of frivolous petitions . . . . Since we do not believe Congress intended an investigation to be conducted on the basis of frivolous petitions, the verification requirement is necessary to establish the legitimacy of the petition and to promote the expeditious handling of abandonment proceedings.
 
 
 79
 The labor organizations do not question the assumption concerning Congress' intention as to frivolous petitions that underlies the requirement of verification. We believe it was within the Commission's broad administrative discretion in procedural matters, See, e. g., Federal Communications Commission v. Schreiber Co., 381 U.S. 279, 289, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), to impose the requirement.[29]
 
 
 80
 As to the time limit, the argument is that Congress, having allowed 55 days (60 days less five days for service on the carrier) for the Commission to order an investigation, must have contemplated that prospective petitioners would have that long to petition. We think that the Commission, in the exercise of its broad discretion to regulate procedure, may impose requirements as to the information to be contained in a petition to investigate in order to assure that the petition is not frivolous and to facilitate and expedite the investigation. For the same reasons, it may provide for a reply by the railroad. Thirty five days is not an unreasonable time for the filing of a petition to investigate, considering the Commission's rejection of suggestions that the petitioner be required to submit detailed information and the fact that a four-month warning that an application for abandonment or discontinuance will be filed must, under § 1a(5)(b) of the Act, be given by way of a system diagram.
 
 
 81
 The objections advanced by the labor organizations are without merit. Section 1126.36 of the regulations is valid.
 
 III
 The Petition of the State of Pennsylvania
 
 82
 In No. 77-1487 the Commonwealth of Pennsylvania challenges the regulations prescribing the revenue data to be submitted by a railroad in an application for abandonment or discontinuance, § 1121.32(d) (which refers to §§ 1121.41-1121.45), because they do not require the information that would be needed for the application of the so-called "50 percent rule," and thus impliedly repudiate that rule. The 50 percent rule is nowhere contained in previous regulations on abandonment applications. It is a product of the consideration of abandonment applications by the Interstate Commerce Commission and is a method of determining, for abandonment purposes, the costs of services beyond the limits of the branch for freight movements which are in part over the branch and in part on lines beyond the branch.
 
 
 83
 The rule operated as follows: The railroad would submit with its abandonment application data showing revenues in each of three categories:
 
 
 84
 (1) freight moving between points on the line;
 
 
 85
 (2) freight moving between a point on the line and a point beyond the line; and
 
 
 86
 (3) bridge traffic, I. e., freight operating at a point off the line and moving over the line en route to a destination beyond the line.
 
 
 87
 The revenues in categories (2) and (3) were divided into on-line and off-line subcategories, usually on a mileage prorated basis. See §§ 1121.1(m) and (n) (1)(i) (1976). The "avoidable cost" for the branch line was then calculated, and 50 per cent of the beyond-line revenue was taken as the cost of beyond-line service.
 
 
 88
 The provisions of which Pennsylvania complains provide for lumping together in one category the revenues from categories (1) and (2), with bridge traffic revenue being a second category. Sections 1121.32(d) and 1121.45. This means the 50 percent rule will not be used in the future.
 
 
 89
 The 50 percent rule apparently was first used (the railroad respondent-intervenors so advise us), in Chicago & North Western Ry. Co. Trustee Abandonment, 230 I.C.C. 645 (1939).[30] In that and subsequent cases it has been described, not as an unvarying standard to be used in all cases, but as a reasonable method of estimating off-branch costs in the absence of a better method. Id. at 652-653; Chicago & North Western Co. Abandonment, 275 I.C.C. 759, 775 (1951); New York, N. H. & H. R. R. Abandonment, 324 I.C.C. 345, 350 (1965); Baltimore & Ohio R. R. Abandonment Landenburg Branch, 354 I.C.C. 67, 74 (1977). In the latter case, the abandonment proceeding had been initiated prior to the 4-R Act so the regulations before us were not in issue. The Commission adopted the variable unit cost method as the better method, Id. at 74, noting that this method was "more accurate" and that, in the abandonment proceeding before it, in contrast to previous decisions in which the Commission had rejected the method, "opposing parties have had adequate notice of applicant's intention to rely upon that technique and access to and opportunity to cross-examine upon both the utilized formula and the underlying working papers." Id. In these earlier cases, particular system operating ratios or variable unit costing methods were rejected because the Commission had not approved the particular method for use in abandonment proceedings, and the protestants to the abandonment application had not been afforded a sufficient opportunity to examine each step in the applicant's computations. East Carolina Ry. Abandonment, 324 I.C.C. 506, 512-513 (1964); Chicago & N. W. Ry. Co. Abandonment, 282 I.C.C. 525, 529-532 (1952); Chicago & N. W. Ry. Co. Abandonment, supra, 275 I.C.C. at 744-776.
 
 
 90
 The regulations before us adopt the variable unit cost method for use in the subsidy phase of the abandonment proceeding.[31] Moreover, as in Baltimore & Ohio R. R. Abandonment Landenburg Branch, supra, 354 I.C.C. at 74, any opposing party does have "adequate notice of (an) applicant's intention to rely upon that technique and access to and opportunity to cross-examine upon, both the utilized formula and the underlying papers." See § 1121.42m. Therefore, the Commission's adoption of the variable unit cost method is not a departure from a prior norm. The Commission's previous position was simply that the 50 percent rule was the standard to be used in determining off-branch costs until a better method was shown to be available and fair to the parties.
 
 
 91
 Pennsylvania does not point to any basis in the language of the statute or the legislative history for its contention that Congress intended to preserve the 50 percent rule, much less to make its use mandatory in all cases. Given that the purpose of revising abandonment procedures was to facilitate relieving the railroads of the burden of continuing uneconomic branch lines and service, it is highly unlikely that Congress would have intended to prohibit the Commission from changing from an arbitrary formula for determining off-branch costs to one more likely to measure those costs realistically.
 
 
 92
 Even assuming, as Pennsylvania would have us do, citing Greyhound Corp. v. I. C. C., 179 U.S.App.D.C. 228, 230, 551 F.2d 414, 416 (1977), that, in abandoning the 50 percent rule, the Commission "has made a substantial departure from prior norms, without adequate explanation," the Commission's regulations are not invalid. As we have observed, the so-called rule is only a formula to be used when a better one is not available. It is a procedural rule analogous to the one involved in Pennsylvania v. United States, 361 F.Supp. 208, 214-215 (M.D.Pa.1973), Affirmed per curiam, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973), where a similar argument was rejected.
 
 
 93
 Moreover, the Commission has provided a sufficient explanation for its abandonment of the formula. In its Report accompanying the regulations it stated that the Pennsylvania proposal for using a variant of the formula "would produce arbitrary and inaccurate results," and was lacking in "conceptual foundation." The Commission had already rejected the 50 percent rule as unreliable and imprecise in adopting its regulations implementing the subsidy provisions of the 1973 Act.[32] It did so apparently without objection from Pennsylvania, and the resulting redefinition of avoidable cost was approved in Pennsylvania v. I. C. C., 175 U.S.App.D.C. 263, 268, 535 F.2d 91, 96 (1976), Cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976). As the Commission said in its Report on Reconsideration of the regulations now before us, the costing standards for subsidy purposes and abandonment or discontinuance purposes should be the same.[33] It had said so in its notice of proposed rulemaking. 41 Fed.Reg. 31878, 31880-31881 (1976).
 
 
 94
 The Commission did not act inconsistently with § 1a or otherwise improperly in abandoning the 50 percent rule and framing the requirements for submission of data accordingly. Pennsylvania's challenge to the regulations is therefore without merit.
 
 
 95
 In No. 76-2283, the challenged regulations are remanded to the Commission for further proceedings consistent with this opinion. In Nos. 77-1008 and 77-1487 the petitions for review are denied.
 
 APPENDIX
 
 96
 Section 1a. (1) No carrier by railroad subject to this chapter shall abandon all or any portion of any of its lines of railroad (hereafter in this section referred to as "abandonment") and no such carrier shall discontinue the operation of all rail service over all or any portion of any such line (hereafter referred to as "discontinuance"), unless such abandonment or discontinuance is described in and covered by a certificate which is issued by the Commission and which declares that the present or future public convenience and necessity require or permit such abandonment or discontinuance. An application for such a certificate shall be submitted to the Commission, together with a notice of intent to abandon or discontinue, not less than 60 days prior to the proposed effective date of such abandonment or discontinuance, and shall be in accordance with such rules and regulations as to form, manner, content, and documentation as the Commission may from time to time prescribe. Abandonments and discontinuances shall be governed by the provisions of this section or by the provisions of any other applicable Federal statute, notwithstanding any inconsistent or contrary provision in any State law or constitution, or any decision, order, or procedure of any State administrative or judicial body. The authority granted to the Commission under this section shall not apply to (a) abandonment or discontinuance with respect to spur, industrial, team, switching, or side tracks if such tracks are located entirely within one State, or (b) any street, suburban, or interurban electric railway which is not operated as part of a general system of rail transportation.
 
 
 97
 (2)(a) Whenever a carrier submits to the Commission a notice of intent to abandon or discontinue, pursuant to paragraph (1) of this section, such carrier shall attach thereto an affidavit certifying that a copy of such notice (i) has been sent by certified mail to the chief executive officer of each State that would be directly affected by such abandonment or discontinuance, (ii) has been posted in each terminal and station on any line of railroad proposed to be so abandoned or discontinued, (iii) has been published for 3 consecutive weeks in a newspaper of general circulation in each county in which all or any part of such line of railroad is located, and (iv) has been mailed, to the extent practicable, to all shippers who have made significant use (as determined by the Commission in its discretion) of such line of railroad during the 12 months preceding such submission.
 
 
 98
 (b) The notice required under subdivision (a) shall include (i) an accurate and understandable summary of the carrier's application for a certificate of abandonment or discontinuance, together with the reasons therefor, and (ii) a statement indicating that each interested person is entitled to recommend to the Commission that it approve, disapprove, or take any other specified action with respect to such application.
 
 
 99
 (3) During the 60-day period between the submission of a completed application for a certificate of abandonment or discontinuance pursuant to paragraph (1) of this section and the proposed effective date of an abandonment or discontinuance, the Commission shall, upon petition, or may, upon its own initiative, cause an investigation to be conducted to assist it in determining what disposition to make of such application. An order to the Commission to implement the preceding sentence must be issued and served upon any affected carrier not less than 5 days prior to the end of such 60-day period. If no such investigation is ordered, the Commission shall issue such a certificate, in accordance with this section, at the end of such 60-day period. If such an investigation is ordered, the Commission shall order a postponement, in whole or in part, in the proposed effective date of the abandonment or discontinuance. Such postponement shall be for such reasonable period of time as is necessary to complete such investigation. Such an investigation may include, but need not be limited to, public hearings at any location reasonably adjacent to the line of railroad involved in the abandonment or discontinuance application, pursuant to rules and regulations of the Commission. Such a hearing may be held upon the request of any interested party or upon the Commission's own initiative. The burden of proof as to public convenience and necessity shall be upon the applicant for a certificate of abandonment or discontinuance.
 
 
 100
 (4) The Commission shall, upon an order with respect to each application for a certificate of abandonment or discontinuance
 
 
 101
 (a) issue such certificate in the form requested by the applicant if it finds that such abandonment or discontinuance is consistent with the public convenience and necessity. In determining whether the proposed abandonment is consistent with the public convenience and necessity, the Commission shall consider whether there will be a serious adverse impact on rural and community development by such abandonment or discontinuance;
 
 
 102
 (b) issue such certificate with modifications in such form and subject to such terms and conditions as are required, in the judgment of the Commission, by the public convenience and necessity; or
 
 
 103
 (c) refuse to issue such certificate.
 
 
 104
 Each such certificate which is issued by the Commission shall contain provisions for the protection of the interests of employees. Such provisions shall be at least as beneficial to such interests as provisions established pursuant to section 5(2)(f) of this Act and pursuant to section 565 of Title 45. If such certificate is issued without an investigation pursuant to paragraph (3) of this section, actual abandonment or discontinuance may take effect, in accordance with such certificate, 30 days after the date of issuance thereof. If such a certificate is issued after an investigation pursuant to such paragraph (3), actual abandonment or discontinuance may take effect, in accordance with such certificate, 120 days after the date of issuance thereof.
 
 
 105
 (5)(a) Each carrier by railroad subject to this part shall, within 180 days after the date of promulgation of regulations by the Commission pursuant to this section, prepare, submit to the Commission, and publish, a full and complete diagram of the transportation system operated, directly or indirectly, by such carrier. Each such diagram which shall include a detailed description of each line of railroad which is "potentially subject to abandonment", as such term is defined by the Commission. Such term shall be defined by the Commission by rules and such rules may include standards which vary by region of the Nation and by railroad or group of railroads. Each such diagram shall also identify any line of railroad as to which such carrier plans to submit an application for a certificate of abandonment or discontinuance in accordance with this section. Each such carrier shall submit to the Commission and publish, in accordance with regulations of the Commission, such amendments to such diagram as are necessary to maintain the accuracy of such diagram.
 
 
 106
 (b) The Commission shall not issue a certificate of abandonment or discontinuance with respect to a line of railroad if such abandonment or discontinuance is opposed by
 
 
 107
 (i) a shipper or any other person who has made significant use (as determined by the Commission in its discretion) of such line of railroad during the 12-month period preceding the submission of an applicable application under paragraph (1) of this section; or(ii) a State, or any political subdivision of a State, if such line of railroad is located, in whole or in part, within such State or political subdivision;
 
 
 108
 unless such line or railroad has been identified and described in a diagram or in an amended diagram which was submitted to the Commission under subdivision (a) at least 4 months prior to the date of submission of an application for such certificate.
 
 
 109
 (6)(a) Whenever the Commission makes a finding, in accordance with this section, that the public convenience and necessity permit the abandonment or discontinuance of a line or railroad, it shall cause such finding to be published in the Federal Register. If, within 30 days of such publication, the Commission further finds that
 
 
 110
 (i) a financially responsible person (including a government entity) has offered financial assistance (in the form of a rail service continuation payment) to enable the rail service involved to be continued; and
 
 
 111
 (ii) it is likely that such proffered assistance would
 
 
 112
 (A) cover the difference between the revenues which are attributable to such line of railroad and the avoidable cost of providing rail freight service on such line, together with a reasonable return on the value of such line; or
 
 
 113
 (B) cover the acquisition cost of all or any portion of such line of railroad;
 
 
 114
 the Commission shall postpone the issuance of a certificate of abandonment or discontinuance for such reasonable time, not to exceed 6 months, as is necessary to enable such person or entity to enter into a binding agreement, with the carrier seeking such abandonment or discontinuance, to provide such assistance or to purchase such line and to provide for the continued operation of rail services over such line. Upon notification to the Commission of the execution of such an assistance or acquisition and operating agreement, the Commission shall postpone the issuance of such a certificate for such period of time as such an agreement (including any extensions or modifications) is in effect.
 
 
 115
 (b) A carrier by railroad subject to this chapter shall promptly make available, to any party considering offering financial assistance in accordance with subdivision (a), its most recent reports on the physical condition of any line of railroad with respect to which it seeks a certificate of abandonment or discontinuance, together with such traffic, revenue, and other data as is necessary to determine the amount of assistance that would be required to continue rail service.
 
 
 116
 (7) Whenever the Commission finds, under paragraph (6)(a) of this section, that an offer of financial assistance has been made, the Commission shall determine the extent to which the avoidable cost of providing rail service plus a reasonable return on the value of rail properties involved exceed the revenues attributable to the line of railroad or the rail service involved.
 
 
 117
 (8) Petitions for abandonment or discontinuance which were filed and pending before the Commission as of February 5, 1976, or prior to the promulgation by the Commission of regulations required under this section shall be governed by the provisions of section 1 of this title which were in effect on February 5, 1976, except that paragraphs (6) and (7) of this section shall be applicable to such petitions.
 
 
 118
 (9) Any abandonment or discontinuance which is contrary to any provision of this section, of any regulation promulgated under this section, or of any terms and conditions of an applicable certificate, may be enjoined by an appropriate district court of the United States in a civil action commenced and maintained by the United States, the Commission, or the attorney general or the transportation regulatory body of an affected State or area. Such a court may impose a civil penalty of not to exceed $5,000 on each person who knowingly authorizes, consents to, or permits any violation of this section or of any regulation under this section.
 
 
 119
 (10) In any instance in which the Commission finds that the present or future public convenience and necessity permit abandonment or discontinuance, the Commission shall make a further finding whether such properties are suitable for use for other public purposes, including roads or highways, other forms of mass transportation, conservation, energy production or transmission, or recreation. If the Commission finds that the properties proposed to be abandoned are suitable for other public purposes, it shall order that such rail properties not be sold, leased, exchanged, or otherwise disposed of except in accordance with such reasonable terms and conditions as are prescribed by the Commission, including, but not limited to, a prohibition on any such disposal, for a period not to exceed 180 days after the effective date of the order permitting abandonment unless such properties have first been offered, upon reasonable terms, for acquisition for public purposes.
 
 
 120
 (11) As used in this section:
 
 
 121
 (a) The term "avoidable cost" means all expenses which would be incurred by a carrier in providing a service which would not be incurred, in the case of discontinuance, if such service were discontinued or, in the case of abandonment, if the line over which such service was provided were abandoned. Such expenses shall include but are not limited to all cash inflows which are foregone and all cash outflows which are incurred by such carrier as a result of not discontinuing or not abandoning such service. Such foregone cash inflows and incurred outflows shall include (i) working capital and required capital expenditures, (ii) expenditures to eliminate deferred maintenance, (iii) the current cost of freight cars, locomotives and other equipment, and (iv) the foregone tax benefits from not retiring properties from rail service and other effects of applicable Federal and State income taxes.
 
 
 122
 (b) The term "reasonable return" shall, in the case of a railroad not in reorganization, be the cost of capital to such railroad (as determined by the Commission), and, in the case of a railroad in reorganization, shall be the mean cost of capital of railroads not in reorganization, as determined by the Commission.
 
 
 123
 SPRECHER, Circuit Judge, concurring in part and dissenting in part:
 
 
 124
 I concur with all portions of the majority opinion except IB.1. concerning the definition of "current cost."
 
 
 125
 It is clear that a railroad is entitled to be subsidized for the avoidable cost it incurs in operating a branch line, which cost is to include the depreciation which occurs to cars and other equipment used on the branch line. The Commission and the railroads disagree concerning what basis should be used to calculate this depreciation, the Commission arguing that the original cost of the branch line equipment is the proper standard, while the railroads contend that the value of new equipment (replacement cost) should provide the standard. I, contrary to the majority, think that the position of the Commission is sound both legally and logically, and would thus deny that portion of the petition for review.
 
 
 126
 Legally, the Commission's position is that it is merely continuing to employ the depreciation standard (original cost) which it has previously used under the Regional Rail Reorganization Act of 1973. There is no legislative history which would support the view that Congress meant to repudiate the Commission's regulation to that effect. Indeed, the only legislative support cited by the majority for its position is the testimony and proposal of one of numerous witnesses before the Senate Subcommittee on Commerce. Without any explicit direction from Congress and without any indication in the legislative history of Congress's dissatisfaction with the original cost standard being used by the Commission, I would conclude that the Commission acted reasonably by interpreting "current cost" to mean the current value of equipment being used on the branch line.
 
 
 127
 Beyond the dispute regarding legislative history, the Commission's position is even more compelling on the basis of logic and economic analysis. We must ask ourselves what is the nature of the present economic saving that would result from discontinuance or abandonment. The majority assumes that the answer is that new equipment would not have to be purchased and thus the cost of this new equipment should set the standard for current costs. While initially appealing, this solution I believe miscomprehends the economic significance of abandonment to a railroad.
 
 
 128
 In basic terms, the present saving that results from discontinuance of a branch line is that the equipment from the branch line can be used on the main line. The use of this equipment does not Replace the purchase of new cars as the railroads contends and as the majority agrees, but rather merely Postpones the purchase of new cars for a period of time determined by the remaining useful life of the transferred equipment. This remaining value of the transferred equipment is approximated by depreciating the original cost of that equipment, as the Commission has mandated in its regulations.
 
 
 129
 The majority would award the railroad the cost of new cars and new equipment no matter what the true condition or usefulness to the railroad of the branch line equipment. I would agree with the Commission's more flexible position that the saving to the railroad is, in reality, merely the remaining value of the transferred cars. In the majority's example, this value would be the original cost of the equipment as depreciated after 29-years, or $3,000. This "use value" of the transferred cars is clearly the only "avoidable cost" the railroads can properly claim. Anything more overvalues the transferred equipment and provides more than mere compensation.
 
 
 130
 Not only do the railroads get an economic windfall under the majority approach, but the result reached there also provides an economic incentive to the railroads to provide poor quality equipment on the branch line. The railroads can always properly claim depreciation for tax purposes at the full rate for any new equipment purchased, which, in the example, is $20,000, whether or not this car is used on the branch line or on the main line. However, since the majority's approach also places a replacement cost value on the 29-year old car being used on the branch line, the railroads get a "subsidy bonus" of the difference between the majority's mandated replacement cost depreciation standard and the true depreciation applicable to the branch equipment, which equals $20,000 minus $3,000 or $17,000. Thus, the railroad receives an effective depreciation value of $37,000 under these standards.
 
 
 131
 This "subsidy bonus" of $17,000 results purely from the use of a replacement cost standard to value branch line equipment, and increases in direct proportion to the decrease in the quality of equipment provided on the branch line. The Commission, on the other hand, would give the railroads a subsidy that reflects the quality of the equipment which is provided, which is $3,000 in the example.
 
 
 132
 If a railroad puts a new car on the branch, then the full depreciation value of that car should be subsidized. If, however, a railroad provides old cars on the branch line, then the subsidy should reflect the true value of those cars, as the Commission's regulations provide. The majority approach results in the anomaly of effectively saying to the railroads, "we will give you a replacement cost depreciation subsidy no matter how poor the condition of the equipment that you provide for the branch line. Indeed, you have the most to gain by using the worst equipment on the branch line."
 
 
 133
 The incentive to provide poor branch line equipment which flows from the majority's conclusion that "current cost" means "replacement cost" is clearly detrimental to continued and improved safety in the provision of rail service on branch lines, which result I would hesitate to reach in light of Congress's silence on this question. Therefore, the petition for review of the regulation concerning "current cost" should be denied.
 
 
 
 *
 Circuit Judge Robert A. Sprecher participated in the original decision but has disqualified himself from consideration of the petition for rehearing
 
 
 [1]
 Section 1a, as amended on October 19, 1976, by the Rail Transportation and Improvement Act, Pub.L. No. 94-555, 90 Stat. 2628, is set forth in an appendix to this opinion
 
 
 [2]
 Federal funds exceeding $680 million were provided in grants and loans in addition to millions in credit guarantees. Hearings on Railroad Amendments of 1976 Before the Subcommittee on Transportation and Commerce of the House Committee on Interstate and Foreign Commerce, 94th Cong., 2d Sess. 158-162 (1976)
 
 
 [3]
 That Act, as amended, appears in 45 U.S.C. § 701, Et seq
 
 
 [4]
 The resulting regulations appear at 49 C.F.R. Part 1125
 
 
 [5]
 The application is to comply in matters of form, manner, content, and documentation, with rules and regulations that the Commission may prescribe
 
 
 [6]
 The investigation may include public hearings. The burden of proving public convenience and necessity is upon the applicant
 
 
 [7]
 Paragraph (5), which is not involved in this proceeding, provides in detail for the filing by each railroad of a transportation system diagram in accordance with regulations to be promulgated by the Commission. The diagrams are to show lines which are "potentially subject to abandonment" and lines as to which the railroad "plans to submit an application for a certificate of abandonment or discontinuance." Updating is required
 
 
 [8]
 In order to assist in the preparation of a subsidy offer, paragraph (6) requires the railroad to supply pertinent data to parties considering offering financial assistance
 
 
 [9]
 We note that acting ICC Chairman Charles Klapp recognized that the language of the statute means what it says when, in testifying before a subcommittee of Congress in June 1976, he stated that an amendment to § 1a(6) he was supporting
 . . . by removing the phrase "not to exceed 6 months," gives the Commission the discretion to extend for a longer period of time the issuance of an abandonment certificate if the circumstances of a particular case make such an additional extension reasonable. This amendment addresses the very real problem of a railroad simply refusing to negotiate in good faith for the statutory 6-month period and thus successfully preventing the making of a subsidy agreement.
 His amendment would have given the Commission authority to extend the negotiating period but to prescribe terms for continued operation if no subsidy agreement was reached within six months. Hearings on Rail Amendments of 1976 Before the House Subcommittee on Transportation and Commerce of the House Committee on Interstate and Foreign Commerce, 94th Cong., 2d Sess. 48 (1976). Congress did not accept Chairman Klapp's proposal and was presumably not persuaded by his policy argument.
 
 
 [10]
 Under § 1121.46 of the regulations subsidy payments are adjusted every year. These adjustments would compensate the railroad for the depreciation costs of equipment purchased in order to provide continued branch line service to the extent that such requirement is actually part of branch line operations. See §§ 1121.42(c)(4) and 1121.42(m)
 
 
 [11]
 In its Report on Reconsideration the Commission stated:
 (W)e believe the congressional intent is that the national standards should follow the conceptual approach of the regional standards. Consequently, the regional standards are being used to provide the foundation upon which the national standards are based.
 
 
 [12]
 J. H. Williams was Manager of the Bureau of Transportation Research of Southern Pacific Transportation Company. Senator Hartke, presiding at the time, called him "one of the bright minds of this business." Hearings 800
 
 
 [13]
 He said,
 The most likely effect of abandonment would be that rolling stock released from serving a light density line's traffic would displace purchases of new rolling stock of similar kind and capacity. To illustrate, if 50 freight cars and one locomotive were required in order to provide subsidized light density line service, cessation of that service would permit the operating carrier to avoid the purchase of 50 new freight cars and one new locomotive. Thus, the calculation of depreciation based on these avoided acquisition (or "purchase new") costs is the correct measure of the avoidable cost of equipment ownership.
 Hearings 800.
 
 
 [14]
 Williams reasoned as follows:
 To the extent publicly subsidized traffic makes no contribution to a carrier's overhead and fair rate of return on its off-branch property, other traffic must bear this entire burden. From the standpoint of treating all rail users equitably, therefore, the relevant cost standard to be used in calculating branch line subsidies should be fully allocated costs.
 Hearings 805.
 
 
 [15]
 The conference substitute was subsequently modified, but the quoted language remained unchanged. After initially passing the conference substitute, both Houses rescinded that action and resubmitted the matter to the Committee on Conference. S.Rep. No. 94-595, 94th Cong., 1st Sess. 133 (1976), U.S.Code Cong. & Admin.News 1976, p. 148. The version of § 1a which was finally adopted, S.Rep. No. 94-595, Supra at 106-109, made these changes: The original conference substitute included in the definition of avoidable cost the reasonable rate of return on the salvage value of the railroad's properties. This element was deleted. Also, the original conference substitute's definition of reasonable return was simply the railroad's cost of capital. This definition was expanded by providing different standards for computing the rate of return for railroads in reorganization and those not in reorganization. Compare S.Rep. No. 94-585, 94th Cong., 1st Sess. 98 (1975) with S.Rep. No. 94-595, Supra at 109
 
 
 [16]
 In our example above, by purchasing the new locomotive to continue branch line service the railroad would incur a capital cost, in addition to a depreciation cost. The language "current cost of freight cars, locomotives and other equipment" in § 1a(11)(a) refers to depreciation cost ("incurred outflows"). The capital cost is a part of "all expenses incurred." See Part I, B, 3, Infra
 
 
 [17]
 We do not understand the dissent to be saying that the reason the perceived windfall occurs is that the railroads receive a tax benefit when the depreciation cost of newly acquired equipment is applied against revenues to decrease taxable income. If that were a reason for excluding the systemwide increased depreciation cost, it would also be a reason for denying subsidy compensation not only for depreciation costs however determined, but for all expenses incurred by continuing branch line service. We express no opinion on the appropriate treatment of the tax effects of allowing replacement costs for subsidy purposes, because that question has not been argued by the parties
 
 
 [18]
 Thus the investment in locomotives and freight cars is not included in the investment base on which return on line is calculated. The return on line element of the subsidy payment is dealt with in § 1121.44 (entitled "Reasonable Return"). Paragraph (c) of that section provides that the return element is to be computed by applying the railroad's rate of return as established in paragraphs (a) or (b) of the section to the value of the branch line as calculated according to § 1121.43 (entitled "Valuation of Rail Properties"). The latter section includes (a) working capital (the excess of current assets over current liabilities), (b) "current income tax benefits resulting from abandonment of the line which would have been applicable to the period of the subsidy agreement," and (c) the net liquidation value "of the railroad properties on the line to be subsidized which are used and required for performance of the services requested by the person offering the subsidy." It does not include investment in locomotives and freight cars
 
 
 [19]
 Section 1121.42 is entitled "Avoidable Costs of Providing Service." Paragraph (c) of that section is entitled "Maintenance of Equipment," and subparagraph (6), entitled "Return on Investment Locomotives," prescribes how the return on investment in locomotives is to be calculated and apportioned between the branch and the rest of the system. Paragraph (L ) is entitled "Freight train car costs" and subparagraphs (3) and (5) prescribe how the return on investment in freight cars is to be included in computing on-branch freight car costs
 
 
 [20]
 The Commission's Report states,
 (T)he railroad should receive a return on the equity in its rolling stock. The proposed standards were not intended to exclude such a return. The standards apply to the entire net equipment investment the same rate of return, in the belief that this would have the advantage of simplicity and minimize paper work. However, inasmuch as the rate specified is the interest rate applicable to the carrier's most recent equipment obligations, rather than the average yield on all such outstanding obligations, and the carrier's actual interest payments are deducted before computing taxable income, the result of this process would be an effective return on the equity portion of the equipment investment substantially higher than this over-all rate.
 Elsewhere in its Report, the Commission, in referring to cost of capital invested in line (see § 1a(11)(b)), said
 (S)ection 1a(11)(b) of the Act clearly envisages that the Commission shall determine the cost of capital for each railroad not in reorganization whenever an offer of subsidy is made, and that determination should include appropriate consideration of all elements, including debt and equity.
 
 
 [21]
 The Commission's Report states,
 AAR objects that these proposed standards fail to allow the operating carrier to recover its full cost of capital for rolling stock by providing only for interest on debt and not equity. It proposes no specific alternative . . . .
 And, later the Report states,
 If any party believes that separate rates of return for the debt and equity portions of the equipment investment are desirable, and is able to propose and substantiate a reasonable basis for computing such separate rates, subsequent revision of the standards to accomplish this could be considered.
 
 
 [22]
 See note 20
 
 
 [23]
 In the course of its decision in that matter the Commission stated as follows:
 The Commission interprets the 4-R Act as requiring the current cost of the overall capital structure. This negates reliance on the debt instruments and direct cash outlays specific to a given car, but requires consideration of the entire capital structure from a current point of view. (P. 35.)
 Debt and equity are independent of each other in arriving at their respective costs. Debt cost is merely the interest rate paid on the debt contracts. Equity cost is the premium that must be paid to attract investor's funds. (P. 49.)
 In a well-managed on-going concern, the cost of equity is determined by the price tag, expressed as a combination of expected dividends and market appreciation of common stock, set on equity funds by the investor. This cost of equity is then included as a component of the cost of capital. (P. 50.)
 Given the unique cost and risk characteristics of equity, it would be erroneous and illogical to tie equity costs to debt interest rates with some fixed percentage relationship. Rather, debt and equity cost components must be calculated separately then brought together in a weight (sic) average. (P. 67.)
 
 
 [24]
 In calculating return on investment in locomotives, the investment base is the gross investment in existing equipment less accrued depreciation and amortization, § 1121.42(c)(6)(ii). In calculating return on investment in freight cars, the investment base is derived from Rail Form A, which uses book cost
 
 
 [25]
 The investment base facet of the argument is raised in a footnote in the railroads' brief in which they take issue with an example in the Commission's Report professing to show that its regulations, by using the cost of debt capital incurred by the railroad in its most recent equipment acquisitions, effectively return to the railroad its cost of equity capital. In the footnote the railroads dispute that the regulations do in fact provide a return on the equity portion of investment, in part relying on the fact that the correct investment base upon which the return on investment in locomotives and freight cars should be calculated is replacement cost
 
 
 [26]
 The Commission has again persisted in an approach it employed under the 1973 Act. Its regulations under that Act provide that "(t)he reasonable return on the value of rail properties . . . shall be the interest rate that is equal to the publicly quoted yield . . . for United States Treasury bonds or notes." 49 C.F.R. § 1125.7. It was pointed out by witness Williams in the hearings that this method of determining capital costs did not reflect the true costs of capital to the trustees of the bankrupt carriers. Hearings 800-801
 
 
 [27]
 The Commission also states,
 In the near future, only one railroad would be affected by this standard, and it seems undesirable to place upon it, or upon persons offering to subsidize its branch lines, the burden of establishing the "mean cost of capital of railroads not in reorganization" which apparently AAR cannot presently supply.
 
 
 [28]
 See notes 18 and 19 and accompanying text
 
 
 [29]
 It is to be noted that the regulations also require that petitions for abandonment or discontinuance be verified by an officer of the carrier, § 1121.32(j), and that replies to a petition for investigation shall be verified, § 1121.36(c)(4)
 
 
 [30]
 In that decision, the Commission rejected the railroad's estimate of its off-branch costs based on its system operating ratio because the railroad's own study of its out-of-pocket cost for beyond-line service indicated that 50 percent of the revenues was a reasonable estimate of that cost
 
 
 [31]
 The regulations direct that an applicant use the same method in determining off-branch costs in its abandonment application as is utilized in determining the sufficiency of a subsidy offer, § 1132(d)(1), referring to § 1121.42(m)(1), which states that off-branch costs "shall be computed by applying variable unit costs." As both stages in the abandonment procedure involve ascertaining the costs incurred by continued branch line use, it is proper that the same method to compute off-branch costs be utilized
 
 
 [32]
 See 49 C.F.R. § 1125.5(k)(1), which states that off-branch avoidable costs "shall be computed by applying variable unit costs to the service units attributed to the branch traffic during the subsidy period." The identical provision was incorporated by the Commission in its subsidy regulations under the 4-R Act. See note 31, Supra
 
 
 [33]
 The Commission stated,
 Logic and sound administration dictate that they should be identical. If it were otherwise, the Commission, the railroad, and the public would be faced with the situation in which a possible offeror of financial assistance would not have the information necessary to formulate such an offer upon the filing of an abandonment application.