846 F.2d 1465
 270 U.S.App.D.C. 6
 ASSOCIATION OF AMERICAN RAILROADS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Patrick W. Simmons, Board of Trade of the City of Chicago,
et al., Illinois Commerce Commission, Intervenors.
 No. 87-1124.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 6, 1988.
Decided May 17, 1988.
 
 John T. Sullivan, with whom Hollis G. Duensing and J. Thomas Tidd, Washington, D.C., were on the brief, for petitioner.
 Charles A. Stark, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, I.C.C., Ellen D. Hanson, Associate Gen. Counsel, I.C.C., John J. Powers, III and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Catherine G. O'Sullivan, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 James E. Weging, Sp. Asst. Atty. Gen., State of Ill., Chicago, Ill., and Gordon P. MacDougall, Washington, D.C., were on the brief for intervenors Ill. Commerce Com'n and Patrick W. Simmons.
 Thomas F. McFarland, Jr., Chicago, Ill., was on the joint brief for intervenor Board of Trade of the City of Chicago, et al.
 Before RUTH BADER GINSBURG, BORK* and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 WILLIAMS, Circuit Judge:
 
 
 1
 The Association of American Railroads here challenges several aspects of the Interstate Commerce Commission's amendments of its regulations on the computation of costs in rail abandonment and subsidy proceedings--the most recent in an apparently endless series of rules on the subject.[1] Abandonment Regulations--Costing, 3 I.C.C.2d 340 (1987), codified at 49 C.F.R. Sec. 1152 (1987). The Association specifically objects to three aspects of the new regulations: (1) the reclassification of return on investment in equipment from an "avoidable" cost to "rate of return" or "opportunity" cost; (2) the use of a real (inflation-adjusted) rate of return in computing opportunity costs and return on investment; and (3) the incorporation of the Regional Subsidy Standards, 49 C.F.R. Sec. 1155 (1987), into the abandonment regulations to calculate costs for train supplies and expenses, fuel, and off-branch expenses.[2] On the first claim we believe that the ICC has failed to reconcile its decision with Chicago & North Western Transportation Co. v. United States, 582 F.2d 1043 (7th Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 641, 58 L.Ed.2d 698 (1978), and we remand the case for it to address that issue. We find no merit in the remaining claims.
 
 
 2
 I. GENERAL BACKGROUND ON ABANDONMENT AND SUBSIDIES
 
 
 3
 Under the Interstate Commerce Act, 49 U.S.C. Secs. 10101-11917 (1982), a carrier may abandon a line (or discontinue service) only if the ICC determines that "the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. Sec. 10903(a). The vague "public convenience or necessity" standard gives the ICC great leeway. See, e.g., Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981); Colorado v. United States, 271 U.S. 153, 168-69, 46 S.Ct. 452, 455-56, 70 L.Ed.2d 878 (1926); Illinois Commerce Commission v. ICC, 776 F.2d 355, 358 (D.C.Cir.1985); Black v. ICC, 737 F.2d 643, 650 (7th Cir.1984). The Commission has, however, promulgated regulations that somewhat guide its discretion. See 49 C.F.R. Sec. 1152 (1987). In the sort of multi-factor analysis with which students of administrative law are painfully familiar, the Commission weighs such items as costs which might be avoided if abandonment is allowed ("avoidable costs"), the costs of tying up investment ("opportunity costs"), profitability, the condition of the line, and future impact on shippers and adjacent communities. See Abandonment Regulations--Costing, 3 I.C.C.2d at 342. The Commission explicitly began considering opportunity costs as a separate factor only in 1980. Abandonment of Railroad Lines--Use of Opportunity Costs, 360 I.C.C. 571 (1979), aff'd sub nom., Farmland Industries, Inc. v. United States, 642 F.2d 208 (7th Cir.1981).
 
 
 4
 An ICC finding that abandonment is warranted is not necessarily the end of the process. 49 U.S.C. Sec. 10905(c) provides that any interested "financially responsible" person can prevent abandonment either by offering to pay the railroad an annual subsidy to keep the line in service or by offering to purchase the line. Here the statutory formula is quite specific: the Commission is to postpone abandonment if it finds that the offered subsidy "is likely" to equal "the difference between the revenues attributable to that part of the railroad line and the avoidable cost of providing rail freight transportation on the line, plus a reasonable return on the value of the line." 49 U.S.C. Sec. 10905(d)(2)(A). If after postponement the parties fail to reach agreement on a subsidy amount, either may ask the Commission to calculate the subsidy. 49 U.S.C. Sec. 10905(e). The Commission's final determination of the subsidy also focuses on the "avoidable cost of providing continued rail transportation, plus a reasonable return on the value of the line." 49 U.S.C. Sec. 10905(f)(1)(B).
 
 
 5
 Although ICC's handling of both the abandonment and subsidy issues involves calculation of "avoidable costs," the statute defines the term only for the subsidy stage. 49 U.S.C. Sec. 10905(a)(1) identifies them as "all expenses that would be incurred by a rail carrier in providing transportation that would not be incurred if the railroad line over which the transportation was provided were abandoned." In turn it defines "expenses" to include "cash inflows foregone and cash outflows incurred" as a result of not abandoning a line, id.; and, finally, defines the latter concept as including
 
 
 6
 (A) working capital and required capital expenditure;
 
 
 7
 (B) expenditures to eliminate deferred maintenance;
 
 
 8
 (C) the current cost of freight cars, locomotives and other equipment; and
 
 
 9
 (D) the foregone tax benefits from not retiring properties from rail services....
 
 
 10
 Id. (emphasis added).
 
 
 11
 Although the statute does not so require, see Illinois Commerce Commission v. ICC, 776 F.2d 355, 359 (D.C.Cir.1985), the Commission uses the same definition of avoidable costs for both abandonment and subsidy purposes, see 49 C.F.R. Secs. 1152.1, 1152.32 (1987). Similarly, it tries at least to a degree to use the same methodology to arrive at "opportunity costs" for abandonment purposes and "rate of return on the value of the line" for subsidy purposes. See Abandonment Regulations--Costing, 3 I.C.C.2d at 345-46. Because the subsidy procedures have evidently been employed only rarely, see Abandonment Regulations--Costing, 3 I.C.C.2d at 343, the practical effect of the regulations here at issue will likely be felt primarily in abandonment proceedings.
 
 
 12
 II. RECLASSIFICATION OF ROI-EQUIPMENT AS AN OPPORTUNITY COST
 
 
 13
 In Chicago & North Western Transportation Co. v. ICC, 582 F.2d 1043 (7th Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 641, 58 L.Ed.2d 698 (1978), the court held that for purposes of calculating the depreciation of freight cars and locomotives for subsidy purposes, 49 U.S.C. Sec. 10905(a)(1)(C)'s reference to "current costs" required the Commission to use replacement cost, rather than original or historic cost. In the current regulations the Commission addressed another aspect of freight car and locomotive costs, namely return on investment, known as "ROI-Equipment" (return on capital rather than return of capital). Its action did not speak directly to the replacement/original cost issue, but was clearly driven by that problem. What it did was simply to reclassify ROI-Equipment from avoidable costs to "rate of return" for subsidy purposes and to "opportunity cost" for abandonment. It explained that it made the change not "simply as an exercise in accounting symmetry," 3 I.C.C.2d at 343, but because of changes in the calculation of return on investment in the avoidable cost regulations, see Revision of Abandonment Regulations, 367 I.C.C. 831 (1983), codified at 49 C.F.R. Secs. 1152.32(g)(3)(ii), 1152.32(h)(1). One of the changes had been made to conform to Chicago & North Western 's requirement that the Commission use replacement rather than original cost. The Commission candidly explained in the present order that as a result of the 1983 changes "return on investment can be highly significant. Its continued retention as an avoidable cost item distorts any determination of the line's profitability." Abandonment Regulations--Costing, 3 I.C.C.2d at 343 (emphasis added). Thus, so far as we can determine, the purpose of the shift was to insulate its calculation of return on rolling stock capital from the effect of Chicago & North Western 's decision on return of such capital.
 
 
 14
 The Association argues that the reclassification violates Chicago & North Western. This argument can only be directed to the classification of ROI-Equipment for subsidy purposes for Sec. 10905 does not govern abandonment proceedings or constrain the Commission's definition of "avoidable cost" for those proceedings. Illinois Commerce Commission, 776 F.2d at 359. So far as abandonment is concerned, then, one may read the Association's attack as a claim that the reclassification makes no sense as a policy choice under the "public convenience and necessity" standard, or that it is inadequately explained.
 
 
 15
 The Commission contends that these claims are unripe; we reject its argument, finding its unripeness argument quite inconsistent with the theory it advanced in adopting the regulations. On the merits, we remand to the Commission so that it may attempt a better explanation of how the decision may fit the requirements of Chicago & North Western (for subsidy purposes) and what its premises are more generally (for abandonment purposes).
 
 A. Ripeness
 
 16
 In Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court set out a test for ripeness that is now entering its third decade as hornbook law. The court is required to evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515.
 
 
 17
 Under our decision in Eagle-Picher Industries, Inc. v. EPA, 759 F.2d 905 (D.C.Cir.1985), the second component presents no difficulty. Taking that component to reflect assumptions that normally the agency's and court's interests would weigh against early review and that such review should occur only if those interests were outweighed by hardship to the challenger, the court made clear that the search for hardship would make no sense if all institutional factors pointed toward early review. Id. at 918. Congress had required petitioners to challenge newly promulgated regulations within 90 days, and thus, the court said, "ha[d] emphatically declared a preference for immediate review." Id. Moreover the agency's preference was for immediate review. Id. at 916-17. There was no special institutional judicial interest in deferring review. In these circumstances, the court dispensed with any independent showing of hardship.
 
 
 18
 The Eagle-Picher exception applies with full force here. In the Hobbs Act, 28 U.S.C. Sec. 2341 et seq. (1982), which provides for judicial review of ICC orders among others, Congress required petitioners to challenge such orders within 60 days of entry. See 28 U.S.C. Sec. 2344. Moreover, while the Commission does not favor immediate review on the reclassification issue, Commission counsel conceded at oral argument that the ICC normally considers pre-application review of abandonment and subsidy regulations appropriate: early clarification of their terms advances the manifest congressional interest in facilitating abandonments. The Commission seeks an exception here only on the ground--to which we turn immediately below--that its ROI-Equipment reclassification raised only an "abstract," non-justiciable issue. As we reject that contention, we find no institutional concern weighing against Congress's preference, and thus find the second requirement of Abbott Laboratories fully satisfied.
 
 
 19
 Accordingly we turn to whether the issue raised is fit for judicial review. Courts normally find an issue fit if it is purely legal or one of legislative intent, Toilet Goods Association v. Gardner, 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967); Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515, and if the agency's action represents its final word on the subject, i.e., its policy has crystallized, Toilet Goods Association, 387 U.S. at 162, 87 S.Ct. at 1523; Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515. But even a purely legal issue about a final agency position may be unfit if the court believes that review would significantly benefit from waiting for the issue to arise in a more concrete form. Toilet Goods Association, 387 U.S. at 163-64, 87 S.Ct. at 1524-25; State Farm Mutual Automobile Ins. Co. v. Dole, 802 F.2d 474, 479, 480 (D.C.Cir.1986); Andrade v. Lauer, 729 F.2d 1475, 1481 (D.C.Cir.1984).
 
 
 20
 The Commission does not dispute fitness for judicial review with direct reference to any of the above elements, which the issue here appears to meet. Rather, it argues that the issue is too abstract because its order may not change the calculation of any subsidy amount or the outcome of any abandonment proceeding. ICC Brief at 16-17. Regarding subsidies, the Commission notes that these are calculated by (1) adding (a) avoidable costs to (b) rate of return on the value of the line (i.e., cost of capital), and (2) subtracting revenues attributable to the line. Thus, the ICC claims, shifting ROI-Equipment between the two types of cost (avoidable costs and cost of capital) cannot change the total costs or net subsidy. Id. at 16. For abandonments, the Commission argues that the effect of the reclassification on its open-ended balancing test is probably inconsequential but impossible to predict. Its brief cites language in the order stating that it will continue its practice of weighing opportunity costs "as a separate factor along with such other factors as profitability, condition of the line, and future impact upon shippers and communities, etc., in deciding whether the public convenience and necessity permit abandonment." Abandonment Regulations--Costing, 3 I.C.C.2d at 342.
 
 
 21
 The Commission's own reasons for adopting its order belie this theory of inconsequentiality. As we noted above, it stressed that the reclassification was more than "an exercise in accounting symmetry," Abandonment Regulations--Costing, 3 I.C.C.2d at 343, and that the changes made in Revision of Abandonment Regulations, 367 I.C.C. 831 (1983), modifying the calculation of avoidable cost, had made return on investment in that context "highly significant." Abandonment Regulations--Costing, 3 I.C.C.2d at 343. The reclassification was necessary, it explained, precisely because ROI-Equipment's "retention as an avoidable cost item distorts any determination of the line's profitability." Id.
 
 
 22
 Indeed, it appears that in deleting ROI-Equipment from "avoidable costs," the Commission shifted it out of a hard category into soft ones. In the subsidy context the avoidable costs category sharply constrains the Commission because there Chicago & North Western appears to require that equipment be valued at replacement cost. 582 F.2d at 1050-53. The disputed change drops ROI-Equipment into rate of return on the value of the line, which is governed by 49 C.F.R. Secs. 1152.34 and 1152.35 (1987). Their import is not crystal clear to us, but is plainly different from replacement cost valuation. For locomotives, for example, the Commission bases cost "on the most recent purchase," 3 I.C.C.2d at 349, which would in some cases produce something like replacement cost, but not in others.
 
 
 23
 In the abandonment context, avoidable costs especially bind the Commission because it traditionally treats such costs as paramount, see Association Reply Brief at 3, and indeed only accepted opportunity costs as relevant in 1980. As to these costs, the Commission says that they "may be calculated in accordance with the methodology approved by the Commission in abandonment adjudications, or by using any other reasonable fully explained method." 49 C.F.R. Sec. 1152.32(p) (1986). Again we are not confident exactly what that treatment may entail. But it must be materially different from treatment under avoidable costs: if not, then the reason supplied by the Commission for the change was completely wrong, and its decision arbitrary and capricious.
 
 
 24
 Further, the Commission rejected the Association's proposal that it give opportunity costs a weight equal to that of avoidable costs, see Abandonment Regulations--Costing, 3 I.C.C.2d at 342, 345. This confirms that it fully intends its change to have important concrete results. If the change is from a right-hand pocket to a left-hand one, it is being made by someone who intends to treat those pockets differently.
 
 
 25
 As the Commission intended to significantly alter the computation of costs in abandonment and subsidy proceedings, and we see no reason to think the change unsuited to that intent, we reject its view that the change is too abstract or inconsequential for review now.
 
 B. Merits
 
 26
 In Chicago & North Western the Seventh Circuit held that in computing avoidable cost for subsidy purposes the Commission must compute the depreciation of rolling stock on the basis of replacement cost. It rested that view on 49 U.S.C. Sec. 10905(a)(1)(C), which refers to "the current cost of freight cars, locomotives, and other equipment" (emphasis added) in its definition of avoidable cost. The court relied on a portion of the legislative history of the Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94-210, 90 Stat. 31 (1976) (codified as amended in scattered sections of Titles 15, 31, 45, and 49 U.S.C.), in which one J.H. Williams, a railroad executive, suggested the language that was eventually included in the Act's definition of avoidable cost. According to the court, Williams meant "the current cost of freight cars [and] locomotives" to describe "cash spent 'to acquire freight cars and locomotives--which the railroad would avoid if the abandonment occurred.' " 582 F.2d at 1052 (quoting Railroads--1975, Hearings Before the Senate Committee on Commerce, 94th Cong., 1st Sess. 805-06 (1975)). In responding to a hypothetical posed by a dissenting judge, the court explained that discontinuance of a branch line using one locomotive would dispense with depreciation of a newly purchased locomotive, "because the railroad would use the old locomotive on the main line instead of buying a new locomotive." Id. at 1053 (emphasis added).
 
 
 27
 As the Commission's recent changes appear to deny replacement cost treatment for ROI-Equipment, the Association claims inconsistency with the depreciation rule decreed in Chicago & North Western. Indeed, the Commission in its order sharply disputed the proposition that discontinuance of a line would spare a railroad the expense of new equipment:
 
 
 28
 We are not persuaded by [the Association's] argument that investment costs are avoidable. Whether or not retention of a particular unit will forestall the purchase of additional units in the future depends on events that are unrelated to the abandonment, since a carrier's need for additional equipment will be based on contemporary economic conditions, and its situation may be such that it may never need to purchase additional units.
 
 
 29
 Abandonment Regulations--Costing, 3 I.C.C.2d at 343-44.
 
 
 30
 Thus the ICC views the issue as a factual one--whether in a particular case, or as a matter of probabilities, discontinuance would enable the railroad to forego new equipment purchases. This seems completely at odds with Chicago & North Western's premise that Congress had determined, as a matter of law, that costs should be calculated on an assumption that abandonment would spare the railroad the cost of new equipment. All its responses to the Association in its order, supporting its denial that ROI-Equipment is avoidable, appear to turn on this difference between its view and the Seventh Circuit's.
 
 
 31
 Accordingly, we remand to the Commission to allow it to better justify the reclassification of ROI-Equipment in light of Chicago & North Western. For subsidy calculations, it would appear that the Commission must either drop the reclassification or reconcile it with a statutory assumption that abandonments enable a railroad to forego purchases of equivalent new rolling stock. Conceivably the Commission does not acquiesce in Chicago & North Western and hopes to create a circuit conflict, as it may well be entitled to do. See United States v. Mendoza, 464 U.S. 154, 160, 104 S.Ct. 568, 572, 78 L.Ed.2d 379 (1984) (noting interests in federal government being able to relitigate issues lost in one circuit). But here it has given no direct hint of any such intent.
 
 
 32
 For abandonments there is a further wrinkle. As we have noted, Sec. 10905's elaborate definition of costs for subsidy calculation does not bind the Commission in this context. Until now, however, the Commission has used common methodologies to calculate costs in both areas. This may reflect some sense that, in view of the links between the two exercises, it makes sense to treat them similarly. Further, there appears to be some dispute over the Commission's belief in a national rolling stock glut--which, if it existed, would decrease the probability that abandonments would enable a railroad to avoid new purchases. Compare Respondents' Brief at 28 & n. 35 (asserting railroads' inability to put freed-up rolling stock to productive use after abandonments) with Revision of Abandonment Regulations, 367 I.C.C. 831, 832 n. 3 (1983) (viewing oversupply as "short term"). We leave to the Commission to consider how to treat ROI-Equipment in the abandonment context in a way that best reconciles its view of the facts with the need for a coherent disposition of both abandonments and subsidies.
 
 
 33
 III. USE OF A REAL RATE OF RETURN IN ABANDONMENT AND SUBSIDY
 
 PROCEEDINGS
 
 34
 The Association attacks the Commission's decision to use a real (inflation-adjusted) rate of return in both abandonment and subsidy determinations. Previously, the ICC had used such a rate only in calculating opportunity costs in abandonment proceedings.
 
 
 35
 As to subsidy proceedings, the Association's essential complaint is that the use of a real rate of return is based on an unsupportable assumption that the value of assets on subsidized lines will appreciate in step with inflation. As we discuss below, we believe the theory suffers one of the prime faults of perfectionism: while it suggests flaws in the Commission's approach, it does not so much as hint at a better one. This is fatal to its attack.
 
 
 36
 As to abandonment proceedings, the Association challenges the validity of the double-counting theory. Here the Commission defends initially on a procedural ground, characterizing the railroads' challenge as a collateral attack on a decision adopted in a 1983 rulemaking, Revision of Abandonment Regulations, 367 I.C.C. 831, 837-38 (1983), aff'd in part sub nom. Illinois Commerce Commission v. ICC, 776 F.2d 355 (D.C.Cir.1985). Although it is a close matter whether the present rulemaking reopened the issue as to abandonments, we believe substantive review appropriate; but we find no error in the Commission's continued adherence to its former analysis.
 
 A. Subsidy Proceedings
 
 37
 The Commission's stated purpose for adopting an inflation-discounted rate of return to calculate the reasonable return on the value of a line is to avoid a double-counting of inflation. The cost of not abandoning a line includes the foregone return on the assets forcibly held in service. A nominal rate of return, such as prevails in the market for loans of dollars, properly includes both a component for the use of capital and an increment to protect the lender from expected inflation. But if such a return is applied to rail assets, it is likely to compensate the railroad twice for the effects of inflation--once in the rate of return and once in increases in the nominal value of the assets. See Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486, 1523-25 (D.C.Cir.), cert. denied, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984). (No one suggests that the Commission includes an inflation estimate in projecting revenues, and we assume it does not. Such an approach would seem inconsistent with the one adopted here.)
 
 
 38
 The petitioner concedes that the use of a nominal rate of return in subsidy determinations may result in double recovery for the shipper because of the effects of inflation. See Association Brief at 41. Its only argument against the use of a real rate of return in subsidy proceedings is that the Commission is mistaken in assuming that the net liquidation value ("NLV") of railroad properties will appreciate in lockstep with the overall rate of inflation in the economy as measured by the Gross National Product price deflator. See Association Brief at 42-43. In reality, it contends, the prices of salvageable rail assets (consisting mostly of scrap rail and real estate) are peculiarly independent of general inflationary trends.
 
 
 39
 We are unable to find any articulation of this point in the Association's submissions to the Commission, but in any event it is without merit. The Commission never claimed that the value of salvageable rail assets would precisely track the general rate of inflation. It noted that the GNP deflator was "a generalized index," which would be appropriate in view of the diversity of the assets involved, but stated that it would "permit carriers to employ a different inflation index if they can convincingly demonstrate that it will produce more accurate results." 3 I.C.C.2d at 349. If any railroad has a better solution (they have suggested none so far), the way remains open for its use.B. Abandonment Proceedings
 
 
 40
 As noted above, the Commission adopted the real rate of return approach for abandonment proceedings in a 1983 rulemaking, Revision of Abandonment Regulations, 367 I.C.C. 831, 837-38 (1983), aff'd in part sub nom. Illinois Commerce Commission v. ICC, 776 F.2d 355 (D.C.Cir.1985). The Association was a party in the rulemaking and an intervenor in the litigation. Indeed the Commission had applied the real rate approach as early as 1980. See Texas & Pacific Ry. Co. Abandonment, 363 I.C.C. 666, 675 (1980). The Commission argues that here the Association is not challenging its latest rulemaking but rather its established practice, embodied in rules for which the 60-day time limit of the Hobbs Act, 28 U.S.C. Sec. 2341 et seq. (1982), has long since barred review.
 
 
 41
 We have recently found an exception to the Hobbs Act's jurisdictional bar, however, "when the agency in question by some new promulgation creates the opportunity for renewed comment and objection." State of Ohio v. EPA, 838 F.2d 1325, 1328 (D.C.Cir.1988). There the agency had requested comments only on "new or changed provisions," id., but it had in its notice "explained the unchanged but republished portion of the regulation ... in general policy terms ... and responded to at least one comment aimed directly at the [previously decided] issue ... itself," id. We take the general principle to be that if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable. See also State of Montana v. Clark, 749 F.2d 740, 743-44 (D.C.Cir.1984), cert. denied, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985).
 
 
 42
 Though the matter is close, we think State of Ohio applicable. There are two ways of characterizing the issue raised by the Commission's rulemaking notice. It may have been saying, "Given our now well-established doctrine for abandonments, the question before us is whether to extend that to subsidy calculation." Or it may have been saying, "We now treat rate of return differently in abandonment and subsidy proceedings. We've recently and regularly used the real rate in the former and explained why. But we want to achieve an intellectually coherent view--either treating them the same or identifying relevant differences. Accordingly, we will review the matter, with a working hypothesis that we'll continue to use the real rate for abandonments."
 
 
 43
 Naturally, since it was not focusing on this distinction, the Commission's language did not readily fit either view. In its rulemaking notice, the Commission explained that its proposed changes would "supplement " those already made with respect to abandonments. Notice of Proposed Rulemaking, Abandonment Regulations--Costing, Joint Appendix ("J.A.") 1 n. 1 (January 11, 1985) (emphasis added). This surely suggests that the abandonment methodology would be treated as given. On the other hand, it observed that in a previous rulemaking it had alluded to its intention "to address this problem and attempt to harmonize these decisions," id. at 2, possibly suggesting that the search for harmony might lead to a rethinking of old positions. As in State of Ohio, the agency offered its generic explanation--the double-counting problem. Id. If a participant in the proceeding had offered a compelling reason to reject the double-counting analysis, it would seem anomalous--to put it charitably--for the Commission to blindly persist in its treatment of abandonments.
 
 
 44
 We thus turn to the merits. In fact we can find no error in the ICC's double-counting analysis. We note at the outset that the Association's comments in the rulemaking went to an issue it does not press here: the distortions it claimed would flow from the combination of using NLV as the asset valuation and a real rate of return. Here its attack seems to be that on abandonment a railroad would convert the rail properties to dollar-denominated assets (bonds, money-market instruments, etc.)[3] and that therefore denial of abandonment denies it the return on such investments--which would be at nominal interest rates. This does not seem to us to undermine the ICC's analysis at all. The Commission is trying to estimate the opportunity cost for a railroad of keeping capital in the form of, say, track and real estate, rather than dollar-denominated assets. In making that comparison it is surely suitable to consider value increases that the railroad will enjoy if forced to hold the physical assets as such. If 5 percent is the expected rate of inflation (generally and for the assets in question--the point dealt with above) and 3 percent is the real cost of capital, then use of the nominal interest rate of (approximately) 8 percent[4] will overstate the railroad's cost. If it liquidated $100,000 worth of assets and re-invested the proceeds it would have $108,000 at the end of the year; if it held the assets, it would have a value of $105,000 (not counting revenue generated, as that is brought in at another point). The rate-of-return cost of non-abandonment is $3,000. We find no error.
 
 
 45
 IV. INCORPORATION OF REGIONAL SUBSIDY STANDARDS
 
 
 46
 The petitioner's third challenge is to the Commission's decision to incorporate the Northeast Regional Subsidy Standards (currently in the Code of Federal Regulations at 49 C.F.R. Sec. 1155 (1987)) into the abandonment and subsidy regulations to calculate the costs of train supplies and expenses, locomotive fuel, and off-branch expenses. (The latter covers a carrier's variable cost of transporting traffic to or from the line proposed for abandonment. See Reasonably Expected Costs, 1 I.C.C.2d 252, 253 n. 2 (1985).) The Association attacks three aspects of this decision.
 
 
 47
 First, the incorporation entails allocating these costs on the basis of a complex formula that takes into account system-wide costs per car-mile, both loaded and empty, and relates them to on-branch car miles, loaded and empty. J.A. at 5. The former system used a ratio of train hours on the branch to total train hours. The gist of the petitioner's argument is that because most of the lines for which abandonment is sought are branch lines carrying slow traffic, the former focus on time was more appropriate.
 
 
 48
 It will be immediately apparent that this takes us into details as to which we have no competence whatever. The Commission noted the Association's concession that abandonments did not involve exclusively short, low-speed branch lines, and asserted that several recent abandonment requests involved longer lines with higher-speed trains. Given the Commission's expertise and the lack of proof to the contrary, we certainly cannot say the Commission was wrong to downplay the significance of the distortion posited by the Association. The Commission further argued, plausibly enough, that it was fairer to consider "distance traveled and traffic density, rather than a single factor (time)." Abandonment Regulations--Costing, 3 I.C.C.2d at 351. Finally, it noted that the new system was more consistent with its Rail Form A methodology,[5] thus avoiding any double counting when on-branch and off-branch costs are totaled. We cannot say that these explanations are unreasonable. "The merits and demerits of the two competing formulas are matters for the Commission's expertise, not ours." General Chemical Corporation v. United States, 817 F.2d 844, 850 (D.C.Cir.1987).
 
 
 49
 Second, the new regulations compute locomotive fuel costs in accordance with the type of locomotive used (using eight possible types), rather than a railroad's system-wide average. The railroads object, asserting that the Commission overlooked the record-keeping burden this would impose. In fact it recognized that burden, but viewed it as "small" and justified by the greater precision. Abandonment Regulations--Costing, 3 I.C.C.2d at 353. The railroads invoke 49 U.S.C. Sec. 10101a(14)'s statement of congressional purpose "to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers" of supplying the information (emphasis added). But they have offered nothing to persuade us that the ICC's judgment was not a reasonable accommodation of the values Congress wished it to balance. See Baltimore Gas & Electric Co. v. ICC, 817 F.2d 108, 115 (D.C.Cir.1987).
 
 
 50
 Finally, the Association claims the ICC ignored the accounting burden resulting from use of the Regional Subsidy Standards to compute off-branch costs for Class II and III railroads.[6] In fact, the Commission noted the Association's argument but concluded the regulation would not be unduly burdensome. Abandonment Regulations--Costing, 3 I.C.C.2d at 355. Specifically, it stated that it was likely that Class II and III railroads already compiled the data necessary to perform the necessary computations. Id. The Association did not challenge this premise in its comments or now. It has no case.
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 Accordingly we remand the case to the Commission to reconsider its reclassification of ROI-Equipment in light of its apparent discordance with Chicago & North Western Transportation Co. v. United States, 582 F.2d 1043 (7th Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 641, 58 L.Ed.2d 698 (1978). Otherwise we deny the petition for review.
 
 
 
 *
 Judge Bork was a member of the Panel at the time of oral argument, but resigned prior to the issuance of this decision
 
 
 [1]
 The ICC has made numerous published revisions to the abandonment regulations since 1976. See, e.g., Abandonment of Railroad Lines and Discontinuance of Service, 354 I.C.C. 129 (1976); Abandonment of Railroad Lines and Discontinuance of Service, 354 I.C.C. 214 (1977); Abandonment of Railroad Lines and Discontinuance of Service, 354 I.C.C. 252 (1976); Abandonment of Rail Lines and Discontinuance of Service, 354 I.C.C. 542 (1978); Related Rail Abandonment Applications, 360 I.C.C. 752 (1980); Abandonment of Railroad Lines--Use of Opportunity Costs, 360 I.C.C. 571 (1979); Abandonment Procedures for Bankrupt Railroads, 360 I.C.C. 615 (1979); Abandonment of Railroad Lines and Discontinuance of Service, 365 I.C.C. 249 (1981); Revision of Abandonment Regulations, 367 I.C.C. 831 (1983); Abandonment of Railroad Lines--Use of Opportunity Costs, 1 I.C.C.2d 203 (1984); Reasonably Expected Costs, 1 I.C.C.2d 252 (1984)
 
 
 [2]
 An "off-branch cost" is the carrier's variable cost of transporting traffic to or from the particular line. See Reasonably Expected Costs, 1 I.C.C.2d 252, 253 n. 2 (1985)
 
 
 [3]
 Petitioner's brief at 28-29 n. 39 actually refers to investment in "cash" but at least in its classic form cash earns no interest at all
 
 
 [4]
 The Commission correctly notes that the nominal rate of interest is slightly more complicated than the sum of expected inflation and the real rate. The correct formula is
 r=[(1+n)/(1+i) ]-1
 where r is the real rate of return, i the expected rate of inflation, and n the nominal interest rate. See 3 I.C.C.2d at 348 n. 12.
 
 
 [5]
 Rail Form A is an accounting system devised by the Commission in 1939 that uses statistical techniques to develop variable unit costs from annual expense and operating information. Its use was approved in Chicago & North Western Railway Co. v. Atchison, Topeka & Santa Fe Railway Co., 387 U.S. 326, 351-56, 87 S.Ct. 1585, 1599-1602, 18 L.Ed.2d 803 (1967)
 
 
 [6]
 Classes II and III include railroads generating annual revenues of less than $88.1 million. See 49 C.F.R. Sec. 1201 (1987)